IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

UNITED STATES OF AMERICA

v.  Case No. <u>2:14cr76</u>

DANIEL CHASE HARRIS

### <u>DEFENDANT DANIEL CHASE HARRIS' POSITION WITH RESPECT TO SENTENCING FACTORS</u>

COMES NOW the defendant, Daniel Chase Harris, and as and for his Position With Respect To Sentencing Factors, respectfully states the following:

### <u>GUIDELINES CALCULATIONS AND PRESENTENCE REPORT (PSR) OBJECTIONS</u>

1. The defendant objects to "The Offense Conduct" at paragraphs 5 through 34 of the PSR in its entirety, based upon the defendant's pleas of not guilty and alibi evidence adduced at trial.

2. The defendant objects to the "Obstruction" allegations set forth in paragraphs 36 through 48 based on the defendant's pleas of not guilty, his denials of any involvement with the "John Anderson" letter, his testimony at trial that the August, 2014 texts were not to obstruct justice but to generate hope with his wife, and his further trial testimony that the instruction letters were never sent by him to inmate Seabolt's wife but were stolen from his personal belongings by inmate Seabolt.

3. The defendant objects to each and every proposed U.S.S.G. sentencing computation based upon his pleas of not guilty and alibi evidence adduced at trial.

4. The defendant objects to the "Increase in Offense Level" contained at paragraph 170 (5 levels) of the PSR as not correctly calculated.

5. The defendant objects to the "Chapter Four Enhancement" at paragraph 172 of the PSR as not applicable.

1

6.	The defendant objects to the "Offense Behavior Not Part of Relevant Conduct" at paragraph 175 of the PSR as being legally irrelevant and immaterial and as not supported by the evidence as being offense behavior.

7.	The defendant objects to the "Obstruction Part 3" ("Chinese Embassy letter") at paragraphs 176-177 of the PSR as not supported by the evidence.

8.	The defendant objects to all "Aliases" on page 3 except "Divot," "Harris, Danny," and "Harris, Dan," and objects to all "Alternate Ids," on the grounds that such do not accurately identify the defendant.

9.	The defendant objects to the inclusion of paragraph 33 that, "Afterwards, D.C. resorted to cutting herself and, in or around November, 2012, attempted suicide by overdosing on adult aspirin," on the grounds that the evidence at trial asserted that the subject D.C. chats were in February, 2013 and thus the foregoing self-destructive behavior could not be causally connected with these chats assigned to the defendant.

10.	The defendant objects to the "Other Potential Victims" information at paragraph 35 on the grounds that there is insufficient evidence to identify or describe any of the referenced chats, images, or videos as involving <u>criminal offenses with minors</u>.

11.	The defendant objects to the "Specific Offense Characteristics: The offense involved the commission of a sexual act or sexual contact," at, e.g., paragraph 57, on the ground that there is no Fourth Circuit precedent supporting such enhancement.

## SECTION 3553(a) FACTORS

18 U.S.C. Section 3553(a) directs that, "The court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of that subsection.

The mandatory minimum term of imprisonment in this case is fifteen (15) years confinement. For the reasons stated below, the defendant respectfully submits that a sentence of fifteen years (180 months) is sufficient, but not greater than necessary, to comply with the above statutory purposes.

A.  <u>The nature and circumstances of the offense</u>.

The offenses for which the defendant was convicted involve production of child pornography, enticing a minor to engage in criminal sexual activity, receipt and possession of child pornography, transportation of child pornography, and obstruction of justice.

The essence of the offenses was that the defendant was found to have engaged in communications with minor females on line and requested photographs of certain of them in various semi-nude presentations, which the minors willingly provided. Thereafter, the defendant was found to have procured sexually explicit, pornographic images and videos of the minors, after threatening to post their images online if the females did not present themselves in sexually explicit, pornographic images and videos.

The offenses were enhanced beyond their base offense level (38) because of the age of some of the victims (between 13 and 15) (2 points); because some of the offenses involved the commission of a sexual act or sexual contact (in the form of self-masturbation) (2 points); because the offenses involved the use of a computer (2 points); and because of obstruction of justice. (2 points).

Based upon the foregoing calculations, with a Criminal History Category of I, the defendant's Guidelines' Adjusted Offense Level would have been 40 (292-365 months). However, because there were multiple counts of the offense, his Guidelines Adjusted Offense Level jumped to 45 (life); and an additional 5 levels were added because of an enhancement, albeit similar to the multiple count enhancement, for "a pattern of activity

involving prohibited sexual conduct" under U.S.S.G. Section 4B1.5(b), defined as "at least two separate occasions."

In effect, therefore, the defendant's Adjusted Offense Level went from 40 (292-365 months) to 50 (life) based essentially on the number of counts of conviction.

The offenses are noteworthy, however, for the absence of certain enhancements.

For example, there is no enhancement for ages under 12, because the offenses did not involve prepubescent females.  There is no enhancement for distribution of child pornography, because none was distributed. There is no enhancement for "sadistic or masochistic conduct or other depictions of violence," because there were no such images or videos.

The absence, therefore, of these particular enhancements, and the associated conduct which they would reflect, is mitigating as to the defendant's conduct in connection with the offenses of conviction.

It is also extremely noteworthy that unlike nearly every other computer-related child pornography offense seen by the Court, including production, not a single image or video from a single child pornography website was found in the defendant's computer media. While it is true that there were such images and videos which the defendant had procured himself from the females with whom he communicated, the extensive computer forensics performed on the defendant's devices yielded no child pornography website visited and no other downloaded images or videos of child pornography other than what the defendant himself procured in live form. Conspicuously absent were the large collections of various child pornographic images and videos traded amongst child pornographers, received from distributors, or otherwise obtained from the Internet, that are so often seen in child pornography computer cases. Indeed, other defendants, who have received far less than

4

life, have been found in possession sometimes of thousands of images of child pornography, re-victimizing the subjects over and over again by viewing such large collections, all of which was absent from the defendant's possession.

Likewise, as alluded to above, there is no evidence that the defendant distributed the images and videos he had, for commercial gain or otherwise. Given the enormous economic incentives that go along with the production of child pornography, the absence of any such motive here and the absence of any attempt to further disseminate these images is, again, a mitigating factor in the defendant's case. While the production and possession of such images by the defendant was no doubt wrong, that he did not further aggravate the situation by distributing or disseminating the images stands in stark contrast to the many similarly convicted defendants who have, and who did not receive life.

The defendant's offenses of conviction are no doubt serious. However, Congress prescribed a mandatory minimum sentence of fifteen (15) years for such offense, not life. Moreover, Congress did not see fit to require that the mandatory minimum sentence for such offenses be served consecutively with any other sentences, which it clearly could have done. Thus, Congress has contemplated that in some cases involving offenses like those of the defendant before the Court, a fifteen-year mandatory minimum sentence, and no more, is sufficient to achieve the purposes of Section 3553(a). While the advisory Guidelines recommend life, Congress only requires fifteen years. Given the mitigating circumstances in connection with the nature and circumstances of the offenses, and the absence of certain offense enhancements and characteristics that are present with other defendants who have not received life, the defendant respectfully submits that not only is life greater than necessary and disproportionate to achieve the 3553(a) purposes, but that fifteen years, as prescribed by Congress as the mandatory minimum, is sufficient to articulate those policies.

B.     The history and characteristics of the defendant.

The evidence at trial revealed that the defendant possesses a remarkable, superior, and exemplary history and character for such a young man, including, as follows:

The defendant, who is 31 years old, was born August 6, 1983 in Jacksonville, FL. His father, who is currently Director of Flight Operations for the Virginia Department of Aviation, retired from the Navy as a pilot holding the rank of Commander. The defendant's maternal grandfather was a pilot retiring at the rank of a two-star Admiral.

The defendant graduated from Manlius High School in Manlius, New York, where he was quarterback of the football team and captain of the team his senior year; starting midfielder on the lacrosse team and captain of the team his senior year; and a member of the academic honor society.

The defendant subsequently received an appointment to the United States Naval Academy where he played four years on the Academy lacrosse team, including helping to take it to a National Championship Final game; and where his very first post-Academy employment was working for a Colonel at the Academy Honors and Ethics Board.

The defendant was subsequently stationed at the Naval Air Station (NAS) Pensacola, where he was screened for naval aviation, and was graded first in his class of 90 prospective pilots.

He then was stationed at NAS Corpus Christi Flight School, where the defendant graduated first of twelve in his class; was placed on the Commodore's List with Distinction signifying that he was in the top five% of all Navy flight school aviators since 1917; and where he was selected for the prestigious position of flying jets.

The defendant thereafter was stationed at the NAS Meridien Jet Flight School, where, again, he was placed on the Commodore's List with Distinction.

The defendant then received his "Gold Pilot Wings," including qualification as a daytime carrier pilot, and a recipient of the "Tophook" award, signifying he had the top grades out of the 30 aviators in his class.

At NAS Lemoore, the defendant was introduced to the F-18 Super Hornet, a fighter-bomber jet aircraft. The defendant graduated number one in his class, and also as a "Priority A" pilot, signifying that he would be permitted to go directly into combat or deploy to a highly strategic location (such as the Japan theatre).

The defendant was then stationed in Japan with an F-18 Super Hornet squadron, during which time he was promoted two ranks from Ensign to Lieutenant; and where he was identified as the number one "E.P." ("early promote" to the next rank - Lieutenant Commander), receiving the highest evaluations of the twelve members of his squadron.

The defendant was then selected for the legendary "Top Gun" program, described as the equivalent of a "master's degree" in the F-18 Super Hornet. The "Top Gun" rating is the highest qualification a pilot can receive in naval aviation. The defendant successfully completed this program.

Thereafter, the defendant was then selected for the highly prestigious Strike Fighter Weapons School Atlantic, where he was sent to teach other pilots how to fly the F-18 Super Hornet in various specialized ways. The defendant became the Strike Fighter Advanced Readiness Program (SFARP) Director, which program F-18 squadrons must complete before deployment. The defendant also became the Air-to-Air Employment Subject Matter Expert for the East Coast, placing him in the position of answering all East Coast inquiries from the Navy, the Marine Corps, and the Air Force about how the F-18 fights an enemy aircraft in air-to-air combat.

The defendant participated in over three hundred (300) carrier landings (including many at night) as a young officer.

Two Navy Captains attested to the defendant's outstanding characteristics. First came Capt. Gordon Cross, stationed at Naval Air Weapons Station China Lake, CA, a 24-year veteran of the Navy and the Commanding Officer of Air Test and Evaluation Squadron 9, "responsible for operational testing of every new weapons system that comes on board...strike fighters which are planes mostly on...carriers." *See* Exhibit 1 attached hereto at pp. 3-10 (copy of Capt. Cross' testimony).

Capt. Fitzhugh Lee followed Capt. Cross. Capt. Lee is stationed at Naval Air Forces in San Diego, a 21-year Navy member, and the Naval Air Force's Total Force Director, whose job is to "man, train and equip Naval Air Forces," (over 100,000 personnel). *See* Exhibit 1 attached hereto at pp. 10-16 (copy of Capt. Lee's testimony).

The combined testimonial endorsement of the defendant by these two Captains, with their breadth of experience and impressive present responsibilities, underscores the superlative history and characteristics which the defendant possesses.

According to the PSR, the defendant received the Navy and Marine Corps Achievement Medal on May 18, 2011 for:

> "professional achievement as schedules officer, aircraft division officer, air-to-air weapons and tactics officer, assistant operations officer and operations and maintenance departments in Strike Fighter Squadron Two Seven, from July 2008 to May 2011, while deployed to the western Pacific Ocean."

PSR at paragraph 200.

Likewise, the PSR noted that the defendant's Fitness Report and Counseling Records "routinely praise his performance." PSR at paragraph 202. As an example, the PSR notes

8

the following from the defendant's most recent report of September 16, 2013, just under two months before his arrest on November 12, 2013:

> LT Harris is a gifted Officer and able tactician, performing at a level above his pay grade. He is ready now for assignments of greater responsibility and promotion to LCDR.
>
> -Expert Manager…His efforts were integral to the combat readiness and worldwide deployment of nine F/A 18 squadrons.
>  ….
>  -Tactical Expert. One of my top instructors at SFWSLANT in knowledge and ability to teach all facets of Strike Fighter employment. His expertise increased combat readiness for countless aircrew as they prepared for combat deployments.
>
> …He has earned my strongest recommendation for promotion, selection for VFA Department Head and VFA Command.

PSR at paragraph 202.

Moreover, in spite of the incredible and impressive responsibilities that the defendant shouldered as a young Navy aviator, the evidence at trial established that he was also a devoted husband who worshipped his wife and would do anything for her. The evidence also demonstrated that he was a doting and loving father of his son (now 4) and his daughter (now 2).

The defendant's father describes him in the PSR as "a 'dream kid'" who provided them with no problems, was motivated and was eager to do well.  PSR at paragraph 189. The defendant's wife states that, "Prior to his incarceration, she believed him to be a wonderful father." PSR at paragraph 193.

His mother characterizes him in the PSR as "'the best son ever. He was always courteous, loving and never got in trouble. He was kind to everyone, child or adult. All his teachers loved him." PSR at paragraph 190. She further describes him as "the most loving,

9

gentle caring parent to his son Sully, whom he adores. He came home from work early, never went out with his friends so that he could get home and take care of Sully." *Id*.

In addition to the trial evidence and PSR evidence described above, attached are eighteen (18) letters attesting to additional observations about defendant's outstanding and remarkably strong and positive history and characteristics. *See* Exhibit 2 attached hereto (collectively, 18 character letters).[1]

Finally, at age 31, the defendant stands before the Court with no criminal history whatsoever - not even a speeding ticket.

Based on the foregoing evidence, the defendant respectfully submits that his history and characteristics support the lowest possible sentence.

C. <u>The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense</u>.

Based upon the mitigating aspects of the offense conduct as described above, the defendant's undisputed superior history and characteristics, the lack of any criminal record whatsoever prior to the instant offenses, and the penalties that have already and will be visited upon defendant in addition to confinement, the defendant respectfully submits that a sentence of fifteen years imprisonment is sufficient,, but not greater than necessary, to satisfy this 3553 (a) factor.

The question becomes one of what quantum of imprisonment under the circumstances of this case is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

Fifteen years is a long time. It spans a decade and a half of one's life. It essentially spans the entire remaining minority of defendant's two small children (ages 4 and 2). It is

---

[1] Although these letters were initially presented to the Magistrate Judge in connection with a detention hearing, their content still very much addresses the defendant's history and characteristics.

the equivalent of almost half of the defendant's entire present lifetime (age 31). It bridges youthful man to well into middle age.

Yet, in addition to this imprisonment, the other punishments to which the defendant has been subjected, and will be subjected, must be viewed as the totality of what has been wrought, to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

First, the defendant will be a convicted felon. He has traveled from highly respected Navy hero to disgraced felony offender. This stigma will remain with him for the rest of his life. His opportunities for employment, socialization, and other elements of daily life will be dramatically restricted in light of his convicted felon status.

Second, the defendant will stand as a registered sex offender, with a lifetime of registration and Internet disclosure ahead of him. This alone is a significant punishment and must be viewed in the total context of what additional confinement punishment is warranted in this case.

Third, the defendant has lost his entire family. Within days of his arrest, the defendant's wife filed for a divorce. Furthermore, his wife has not permitted the defendant to have any contact of any kind with his children since February, 2014, over 16 months ago. In addition, his wife presently seeks a divorce condition wherein the defendant would be forbidden from ever having any contact again with his minor children. As the PSR notes, the defendant has been treating on an out-patient basis since September, 2014 with a psychologist visiting him at the Western Tidewater Regional Jail. As the PSR further indicates, "His primary diagnosis is depression, which the defendant confides is the result of lack of contact with his wife, children and lack of support from his father." The defendant has been "having thoughts of suicide but no plans to act on them." PSR at paragraph 196.

Fourth, the defendant has forever lost his honorable employment as a Naval Academy graduate and a Naval officer. He will undoubtedly be discharged from the Service with an Other Than Honorable Discharge. For a man so driven to achieve as a Naval aviator, and a man whose grandfather was a two-star pilot Admiral and whose father was a Navy pilot Commander, this is excruciating punishment in and of itself.

In a word, the defendant has lost everything. He has been banished from his wife and children, will be ripped away from his Naval Service, and will suffer at least fifteen years in a federal prison. To say that all of the foregoing is sufficient punishment enough is an understatement. The totality of these punishments is sufficient to articulate the seriousness of the defendant's conduct, promote respect for the law, and provide just punishment. Counsel respectfully urges that more would simply be excessive under the total circumstances of this case.

D.  <u>The need for the sentence imposed to afford adequate deterrence to criminal conduct</u>.

The defendant respectfully incorporates by reference his previous argument under C. above. The same total punishment presentation that the defendant suffers with a fifteen-year period of imprisonment, applies to the 3553 (a) factor involving general deterrence.

Knowing that one's life is destroyed, their family is taken, their employment is ruined, their mental health is pathologically affected, their persona defined as a felon and registered sex offender forevermore, and their freedom is taken for fifteen years in federal prison, is adequate to deter others from doing what the defendant was found to have done in this case.

E.  <u>The need for the sentence imposed to protect the public from further crimes of the defendant</u>.

By the very absence of any criminal history, by the very presence of his superlative history and characteristics, and by the profoundly disastrous losses that the defendant has suffered, fifteen years imprisonment added to those losses is sufficient to deter the defendant from future misconduct.

Moreover, counsel for the defendant offers the following additional rationale in support of why a sentence in excess of fifteen years is neither required nor necessary in this particular case:

Although the defendant stands convicted of child pornography-related offenses, counsel respectfully submits that this is really not a case of a hardened child pornographer who must be placed behind bars for decades in order to protect society from his purported predatory conduct. While the medium by which the defendant's aberrant behavior was manifested came in the form of child pornography-related offenses, counsel respectfully submits that sex offender behavior and related desires are not truly at the heart of these offenses.

This is why there is a total absence of child pornography images from websites, or of collections of child pornography images, other than what the defendant himself could create.

Rather, counsel respectfully submits that these offenses really represent an issue of control – a man who was driven by himself since high school to perform at such high levels of achievement in everything he did that, quite frankly, he lost control over his life. The defendant became a slave to his own aspirations, his self-expectations, and his efforts to succeed. Attaining those achievements controlled the defendant – whether it was being the best student, the best lacrosse player, the best pilot, the best husband, the best son. At some point, the need to succeed overcame the defendant's ability to control his own life.

13

The grandson of a two-star Admiral, the son of a Navy Commander pilot, the son-in-law of a Navy Surface Warfare Commander, the defendant's life seemed scripted for him in every way. Succeeding in that scripted life became a dogged goal, regardless of the effects on the defendant's own inner mind.

At some point, being controlled by events caught up with the defendant, and he rebelled psychologically, unconsciously, unknowingly, seeking instead to wrest some kind of control for himself other than the quests for perfection that had been controlling him for years. Counsel respectfully submits that that is when the defendant turned to the conduct at issue – a secret and mostly fantasy world where the defendant himself had some modicum of control over events, contrary to what his outside life had been.

When law enforcement activity eventually caught up with the defendant, the realization and recognition of his behavior was too shameful to allow him to admit to his flaws. Instead, the defendant went into deep denial and repression, and hence the obstructionist conduct occurred in a desperate effort both to maintain the facade of perfection and to avoid the humiliation of child pornography-related conduct.

This analysis of counsel is highly significant and important, because if counsel is correct, and the child pornography-related activities in this case (and the absence of website or imported collection images) reflect not a hardened sex offender but a deeper conflict within the defendant regarding an outside life careening out of control, then such a conflict is well within the range of curable conduct. If the defendant is not a true sex offender but an individual who projected an internal psychological conflict through that child pornography activity, then removal of the conflict that resulted in the behavior to begin with, assures no repeat of the behavior.

In this regard, the defendant's downfall is also the pile of ashes from which can arise a new person, a fresh person, a reformed person.  After fifteen years of imprisonment, the defendant no longer will have an environment such as his pre-incarceration world where he is driven to such heights of perfection. The defendant will have suffered a complete loss of the very things which drove him to a state of lack of control. While this is extremely difficult for the defendant, and constitutes severe punishment in and of itself as argued above, it allows the defendant to start with a clean slate. The defendant will have an environment in which it is possible to thrive and produce without being driven to the kinds of superhuman limits in the past, and in which the engagement in child pornography-related activities serves absolutely no psychological or personal goal or purpose.

In sum, the offense conduct involved in this case was not an end unto itself, as with most child pornographers, but a symptom and sign of a total breakdown in other ways. The unique circumstances and atmosphere in the defendant's life that resulted in what occurred in this case will never align again; and, accordingly, the Court need not be concerned about specific deterrence of the defendant from this kind of criminal conduct after a fifteen-year stint in a federal penitentiary.

Otherwise stated, putting fifteen years of distance between the circumstances of the defendant's life that created the conditions for the offense conduct in this case, and the defendant's return to society, is sufficient to deter any further misconduct by this defendant.

F.     <u>To provide the defendant with needed …medical care, or other correctional treatment in the most effective manner.</u>

The defendant acknowledges the benefit of therapy and counseling, as evidenced by his receptiveness to such on an out-patient basis as an inmate at Western Tidewater Regional Jail.

15

Counsel further recognizes that the defendant will need additional therapy, not just on the more obvious basis of a sex offender therapy program, but on the more basic level of the internal conflicts, discussed above, that really in fact created the conditions which led to these offenses.

Accordingly, the defendant respectfully submits that a fifteen-year sentence, coupled with recommendations for such treatment from the Court to the Bureau of Prisons, is sufficient to address the medical and other correctional needs of the defendant in an institutional setting.

      G.    <u>The kinds of sentences available</u>.

As has been argued throughout this pleading, the Court is mandated by Congress to sentence the defendant to at least one fifteen-year sentence. However, as previously noted, the Court is not required to sentence the defendant to any greater active sentence than fifteen years. Congress has not seen fit to require the fifteen-year mandatory minimums to be run consecutively, but, rather, has vested the Court with the power to run such sentences concurrently.

For all of the reasons stated above, the defendant respectfully repeats his resolute position that such a mandatory minimum sentence is sufficient, but not greater than necessary, to promote the purposes of the 3553 (a) factors.

<u>**CONCLUSION**</u>

For all of the above reasons, therefore, the defendant respectfully moves the Court for a sentence of fifteen years imprisonment, the mandatory minimum required by law.

                                DANIEL CHASE HARRIS
                                By: _____/s/_____
                                   Andrew M. Sacks, Esquire

Andrew M. Sacks, Esquire, VSB#: 20082
Stanley E. Sacks, Esquire, VSB# 04305
Attorneys for defendant Daniel Harris
SACKS & SACKS, P.C.
Town Point Center
150 Boush Street, Suite 501
Norfolk, VA 23510
Telephone: (757) 623-2753
Facsimile: (757) 274-0148
E-mail: andrewsacks@lawfirmofsacksandsacks.com

### CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of July, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to:

>Elizabeth M. Yusi, Esquire
>Assistant United States Attorney
>United States Attorney's Office
>8000 World Trade Center
>101 West Main Street
>Norfolk, VA 23510
>Phone: (757) 441-6331
>Email: elizabeth.yusi@usdoj.gov



/s/
Andrew M. Sacks, Esquire

Andrew M. Sacks, Esquire, VSB#: 20082
Stanley E. Sacks, Esquire, VSB# 04305
Attorneys for defendant Daniel Harris
SACKS & SACKS, P.C.
Town Point Center
150 Boush Street, Suite 501
Norfolk, VA 23510
Telephone: (757) 623-2753
Facsimile: (757) 274-0148
E-mail: andrewsacks@lawfirmofsacksandsacks.com

F:\HOME\IC\HARRIS Daniel\PositionSentFactors7 6 15.docx