IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:14cr76 |
| | ) | |
| DANIEL CHASE HARRIS, | ) | |
| | ) | |
| Defendant. | ) | |

POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, by Dana J. Boente, United States Attorney, Elizabeth M.

Yusi, Assistant United States Attorney, and D. Wesley Nance, Special Assistant United States

Attorney, offers this position paper regarding the sentencing factors stated in 18 U.S.C. §3553(a).

The government has no objections to the content of the Presentence Investigation Report (PSR).

According to the PSR, the advisory guidelines under the United States Sentencing Guidelines

(U.S.S.G. or "Guidelines") call for life imprisonment.   Based on the heinous nature of the

offenses, the obstruction of justice, the defendant's history, characteristics and related conduct, the

undersigned is authorized to request a sentence of at least fifty years' imprisonment and lifetime

supervised release.   In support of its position, the government states as follows:

## I.   BACKGROUND

On February 18, 2015, the trial of defendant DANIEL CHASE HARRIS began before this

Court.   The government presented a plethora of evidence to support its contention that HARRIS

would pose as a teenage boy on Facebook, find girls between the ages of 12 and 17 to strike up a

conversation with, and then encourage the girls to send sexually explicit images of themselves to

him.   Once HARRIS received a picture or something he could use as leverage, he would extort the

girls with threats of public exposure if they did not comply with his orders to perform sex acts, take

videos or pictures of the acts, or be on Skype where HARRIS could record the instances himself. On March 9, 2015, the defendant was convicted of all counts, which included multiple counts of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), Online Enticement, in violation of 18 U.S.C. § 2422(b), Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1), Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), and Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(2).   Just based on the victims that were included in the crimes of conviction, the defendant is responsible for the sexual abuse of nine different girls, on numerous occasions, and over a period of years.   The girls' ages range from 12 years-old to 17 years-old.

HARRIS is scheduled to be sentenced on Monday, July 13, 2015.   At that time, the government requests the Court to consider whether HARRIS, the victimizer and manipulator of hundreds of girls, should have a chance to victimize and manipulate society again.

## A.   H.M. and the Discovery of Harris

The investigation began on July 23, 2013, when investigators with the Bedford County Sheriff's Office, Southern Virginia Internet Crimes Against Children Task Force (SOVA ICAC), were contacted by the parents of H.M., a 14 year-old girl from Bedford, Virginia, who wanted to file a complaint that H.M. was being threatened by an individual she had met online.   Testimony (Test.) of H.M. and Sgt. Stephen Anders.   SOVA ICAC Investigator Danny Viar met with H.M. and her parents.   *Id.*   The investigation revealed that H.M. was on Facebook and received a message from a previously unknown person named "Steve Crofton."   Test. of H.M.; G. Exs. 27, 28A, 29-30.   Crofton claimed he was a teenage boy and thought H.M. was cute.   *Id.*   He convinced H.M. to send a topless picture of her, which she eventually did.   *Id.*   After he received

2

that picture, he demanded a picture of her entire body, including her vaginal area.   *Id.*   H.M. "blocked" Steve Crofton from her Facebook page.   *Id.*

Then, "Will Williams." contacted H.M. on Facebook.   Test. of H.M.; G. Ex. 28B.   He stated that he was going to post her topless picture on a pornography site if she did not send him the other pictures he wanted.   *Id.*   H.M., out of panic, then told her dad and step-mother what was going on.   *Id.*   They, in turn, called the police.   *Id.*

H.M. and her parents granted permission to Inv. Viar to assume H.M.'s online identity and they provided him with H.M.'s Facebook account password.   Test. of H.M. and Sgt. Anders. Shortly thereafter, Inv. Viar logged onto H.M.'s Facebook account and was contacted by "Will Williams."   G. Ex. 113.   Williams demanded Inv. Viar send more nude photos or he would post what he had online.   *Id.*   Inv. Viar informed Williams that he did not believe he had any pictures of H.M. and if he did, to prove it.   *Id.*   Williams then sent a topless picture of H.M. to Inv. Viar over Facebook.   *Id.*   Williams then continued to threaten Inv. Viar with the posting of the images if he did not send him more images.   *Id.*   Williams also stated that he was the same person that was using the screen name "Steve Crofton."   *Id.*

On July 24, 2013, Inv. Viar logged back onto the Facebook account.   G. Ex. 113.   Shortly thereafter, Inv. Viar was contacted once again by "Will Williams."   *Id.*   Williams again started telling Inv. Viar to send more photos.   *Id.*   Williams also stated he wanted Inv. Viar to get on Skype.   *Id.*   Williams stated he had done this with other girls and made $35,000.00.   *Id.* Williams instructed Inv. Viar to masturbate and moan after getting on Skype and stated the more "she" did the more money they could make.   *Id.*   Williams also instructed the Inv. Viar to set up a PayPal account for all the money they would make.   *Id.*   Williams continued to threaten Inv. Viar

3

with the posting of the previous images to public pornography sites and to H.M.'s "friends" list, if he did not receive more images.   *Id.*

On or about July 25, 2013, Inv. Viar obtained a state search warrant for the Facebook account of "Steve Crofton."   G. Ex. 100.   Facebook responded that the account was set up on June 2, 2013, using a Yahoo! e-mail address "s.crofton@yahoo.com" and the IP address 108.11.162.91.   G. Ex. 101.   The latter IP address was controlled by Verizon.   After service of process, Verizon informed the investigators that the account utilizing the IP address at that date and time was assigned to customer DANIEL CHASE HARRIS at his residence in Virginia Beach. G. Ex. 103.

On November 12, 2013, Inv. Viar, with help from members of the Virginia Beach Police Department (VBPD), executed a state search warrant at the residence of HARRIS.   Test. of Det. Ryan Jason, Det. Derek Sloan, Det. Kyle Coffrin, Det. Dean Massetti.   Pursuant to the warrant, a number of different computer media was seized from the residence.   *Id.*, G. Exs. 31, 33, 38A, 38B.

Also during the execution of the search warrant, DANIEL HARRIS was also interviewed. G. Exs. 150, 150A.   During the interview, HARRIS admitted to his activities related to Facebook and the contact he had been having with underage girls.   *Id.*   HARRIS admitted he had been texting and interacting with girls through Facebook and Skype, and he had actually been contacting one of the girls on his iPhone when the investigators had knocked on his door that morning.   *Id.*   HARRIS admitted he would get the underage girls to send him nude photos and then threaten the underage girls with posting the photos online if they did not send him more.   *Id.* HARRIS also admitted to using the Facebook screen names "Will Williams" and "Steve Crofton." Finally, HARRIS wrote a letter of apology to H.M. and her family.   *Id.*; G. Ex. 151.

4

After the search warrant, the seized computers and related items were forensically examined and revealed approximately numerous videos and images of minors engaging in sexually explicit conduct.   G. Exs. 23, 70, 71-71A, 72-72A, 73-73A, 74-74A, 75-75A, 76-76A, 77-77A, 81, 85-93.   The images and videos mainly depicted girls being taped by HARRIS' computer during chat sessions, or "selfies" that were taken and sent to HARRIS.   *Id.*   The discovered files were on a Dell laptop computer (in deleted space and restore points) and on a blue Lexar USB thumb drive.   *Id.*   In addition, Skype records and chat logs were recovered documenting HARRIS' communications between HARRIS and multiple underage girls.   G. Exs. 70A-70C, 71C-71E, 72C-72E, 73C-73E, 74C-75F, 75C-75F, 76C-76D, and 77C-77F.   Besides the laptop and USB thumb drive, these Skype records and chats were also found in external hard drives and an iMac desktop computer.   *Id.*, G. Ex. 95.   HARRIS used the Skype names "Roanokesports16" and others to communicate with underage girls.   *Id.*   The recovered Skype logs were dated between early 2011 through the fall of 2013 and revealed multiple instances of HARRIS threatening to post pornographic pictures of underage girls to various websites unless they continued to provide him with more graphic images.   *Id.*

H.M. will present testimony and/or a statement at the July 13, 2015, sentencing concerning the impact that HARRIS' crimes had had on her and her family.

**B.     A.L. and the Parallel Investigation**

In October 2013, Homeland Security Investigations (HSI) in Norfolk received information from the HSI Attaché in Tokyo, Japan, regarding a complaint from the father of A.L., who was 13 years-old at the time.   Test. of HSI SA Paul Wolpert.   The father, B.L., stated that A.L. had been communicating with someone named "Steve Glass," whom she believed to be a sixteen year-old male, on Facebook and through Skype.   Testimony of B.L.   Steve Glass also used the Skype

nickname "Roanokesports16" to communicate with A.L..   Test. SA Wolpert, A.L. and B.L.   At the request of Steve Glass, during the communications, A.L. sent sexually explicit images of herself.   Test. of A.L.; G. Exs. 8, 9, 70-70C.   B.L. stated he discovered the communications between A.L. and Steve Glass and confronted A.L.   Test. of B.L.   B.L. also went on A.L.'s account and attempted to get Steve Glass to show himself on the webcam which resulted in Steve Glass declining and threatening A.L. again for more images.   *Id.*, G. Ex. 21.   A.L.'s father revealed himself and informed Steve Glass he knew what was going on and that would report him to the police.   Shortly thereafter Steve Glass "defriended" A.L. from his Facebook account.

A.L. testified that she had been communicating with Steve Glass believing he was 16 year-old but had recently seen him on Skype and realized he was not a teenage boy but an older adult male.   Test. of A.L.   A.L. stated she attempted to cease her communications with Steve Glass and he threatened her with the release of her naked pictures if she did not send him more.   *Id.*   Steve Glass also had A.L. expose herself through her window, and at one time made her go outside at night to try to get a stranger to touch her.   *Id.*   All of this was done due to the threats made by Glass.   At one point, HARRIS accidentally showed his face to A.L. on Skype.   *Id.*   At trial, A.L. recognized HARRIS from the images she saw of him on Skype.   *Id.*

In addition to the report given to the agents in Tokyo, A.L. and her father granted permission for the agents to assume A.L.'s online accounts as well as consent for the agents to examine A.L.'s laptop computer.   Test. of SA Wolpert, B.L.; G. Ex. 6.   The laptop was forwarded to HSI Norfolk for examination.   Test. of SA Wolpert.   A review of the laptop resulted in the recovery of sexually explicit images created images by A.L. at the request of Steve Glass, which A.L. then sent to Steve Glass.   *Id.*, G. Exs. 8-9, 21-23.   The examination also revealed data containing the Facebook identity of Steve Glass, as "steve.glass.71653."   G. Ex. 9.

6

Sexually explicit images of A.L. were also found on the USB thumb drive found in HARRIS' residence.   G. Exs. 22, 70.   Steve Glass instructed her on what he wanted in the videos. Test. of A.L., G. Ex. 21.   There were also images of A.L. on the desktop of HARRIS' laptop computer from a restore point.   Test. of Sgt. Josh Taylor; G. Ex. 86.

To identify "Steve Glass," on or about February 18, 2014, HSI issued an administrative summons to Facebook for subscriber information and IP logs for the Facebook account steve.glass.71653.   Test. of SA Wolpert.   Facebook responded with the account information and IP connection logs for the account.   G. Ex. 10A.   A review of the IP logs revealed they resolved to Verizon, Verizon Wireless, and Comcast.   Test. of SA Wolpert.

HSI then issued an administrative summons to Verizon for the account utilizing numerous IP addresses.   Test. of SA Wolpert.   Verizon responded to the summons with the subscriber information for the requested IP addresses, dates and times.   G. Ex. 12-15.   The account using all the requested IP addresses was subscribed to by DANIEL HARRIS at his residence in Virginia Beach, Virginia.   *Id.*

HSI also issued a summons to Comcast, which then referred HSI to Construction Communications Services, a contractor that provides Internet service to certain military stations. G. Ex. 16.   Construction Communications Services stated that that IP address used to communicate on the dates and time that Steve Glass communicated with A.L. resolved to the Fly Navy officers' quarters in Key West, Florida.   G. Ex. 17.   Documents from the U.S. Navy reveal that HARRIS was on temporary duty in Key West, FL during the dates and times Steve Glass communicated with A.L.   G. Ex. 19.   HARRIS was located in Key West, Florida, at the time of the September 28, 2013, offense against A.L.   *Id.*   He then traveled with the sexually explicit images of A.L. to the Eastern District of Virginia.

7

**C.   The Discovery of E.K. and H.K.**

The forensic examination and investigation also revealed and identified victims E.K. and H.K., two sisters from Roanoke County, VA.   H.K. was approximately 14 years-old in 2010 when she first met HARRIS, who was using one of many different names online.   Test. of H.K.   H.K. spoke with HARRIS via AIM and Meebo at first, and then Skype.   *Id.*   Over almost 2 years, HARRIS routinely threatened H.K. into performing numerous sex acts on camera and he taped many of those sessions.   *Id.*; G. Exs. 77C-77I.   HARRIS was located in Japan, Guam, Virginia Beach, South Carolina and Fallon, Nevada during these crimes.   G. Exs. 19, 77J.

HARRIS threatened H.K. so much so that she threatened to kill herself on numerous occasions during chats, but HARRIS continued to demand more sexually explicit videos, including demanding H.K. insert things into her vagina.   G. Ex. 77C.   On one occasion, HARRIS made H.K. attempt to get sexually explicit images of E.K., her younger sister, by convincing E.K. to change in front of the computer.   Test. of H.K.   H.K. was also the victim in the "reflection" videos from Japan that showed HARRIS' reflection, as well as the videos that contained GPS (iPhone) showing he was in South Carolina for work (which matched his travel once again).   G. Exs. 19, 77A, 77G, 77I.   H.K. was also the victim in the video where HARRIS inadvertently recorded himself speaking with his wife while he was in Fallon, Nevada.   *Id.*, G. Ex. 77J.

Eventually, HARRIS friended E.K., H.K.'s younger sister, using one of the many Facebook personas he created.   Test. of E.K. .   E.K. was approximately 14 years-old when she started to speak with HARRIS.   *Id.*; G. Exs. 71-71E.   Again, HARRIS routinely demanded sexually explicit photos of E.K. or he would send her images to her high school or post them on a pornography website.   *Id.*

8

Neither H.K. nor E.K. told anyone about HARRIS' threats or their communications with him until law enforcement identified them after the review of HARRIS' computers.   Test. of H.K. and E.K.

H.K. and E.K. will present testimony and/or a statement at the July 13, 2015, sentencing concerning the impact HARRIS' crimes have had on them.

**D.   The Discovery of D.C.**

D.C. was 12 years old when she met HARRIS online.   Test. of D.C.; G. Exs. 75-75F.   Like the others, D.C. thought she was talking to a teenage boy.   *Id.*.   In reality, she was talking to HARRIS who was on temporary duty in Florida at the time.   *Id.*; G. Ex. 19.   At one point, HARRIS accidentally revealed his face to D.C. on Skype.   Test. of D.C.; G. Ex. 75D.   Realizing he was not a teenage boy, D.C. tried to cut off the communication.   However, HARRIS began to terrorize her.   *Id.*   HARRIS forced D.C. to perform sexual acts for his benefit by threatening her with public exposure.   Test. of D.C.; G. Exs. 75-75F.   At one point, D.C. begged for HARRIS to stop, but HARRIS continued:

D.C.:         Plz nooooo I got raped when I was ten this is Worce plz dnt

HARRIS:      if u dont call me right now i hit send to your schools list serve

G. Ex. 75D.

Immediately after this occurred, D.C. attempted to kill herself and was hospitalized.   D.C. and her mother will be testifying and/or providing a statement at the July 13, 2015, sentencing concerning the impact HARRIS has had on their lives and family.

**E.   The Discovery of K.L.**

Law enforcement discovered K.L., who was 14 years old when she was victimized by HARRIS.   K.L. started talking to HARRIS online, thinking he was a teenage boy.   Test. of K.L.;

G. Exs. 76-76E.   Once again, HARRIS extorted K.L. for sexually explicit images.   *Id.*   He threatened that he knew where she lived and that he had siblings he could find, so she felt forced to comply.   *Id.*

As a result of this crime, K.L. thought about killing herself.   K.L. will attend the July 13, 2015, sentencing to testify and/or provide a statement concerning HARRIS' crimes and how it has affected her.

**F.   The Discovery of D.R.**

D.R. was living in Georgia when HARRIS found her online.   Test. of Cynthia R. HARRIS used D.R.'s attempts at modeling to coerce her to send revealing images, which HARRIS then used against D.R. to get more sexually explicit images of her.   G. Exs. 74-74G.   When HARRIS' first attempts were rebuffed, he then changed Skype names and was more successful in his extortion the second time.   G. Ex. 74E.   D.R.'s mother, Cynthia R., testified at HARRIS' trial that she knew the images introduced were of her daughter.   She also testified that in May 2012, D.R. was only 17 years-old.

**G.   The Discovery of C.K.**

C.K. was 14 years-old when she was found by HARRIS online.   Test. of C.K.; G. Exs. 73-73E.   C.K. stated that she thought HARRIS was a teenage boy, but then HARRIS started extorting her to make sexually explicit videos.   *Id.*   Once again, C.K. felt she had no choice or HARRIS would send images of her to friends and family.   *Id.*   Thus, C.K. fell to HARRIS' manipulation and complied with HARRIS' perverted demands.

**H.   The Discovery of A.W.**

A.W. was 17 years-old when HARRIS extorted her online.   Test. of A.W.; G. Exs. 72-72E.   Once again, HARRIS pretended he was a teenage boy and then began extorting A.W. for

10

sexually explicit images.   *Id.*   A.W. testified at HARRIS' trial.   If the Court recalls, A.W. was an extremely petite blonde who looked and acted much younger than even 17 years-old.   In a very short period of time, A.W. was led to believe online that HARRIS loved her and was going to be her boyfriend.   G. Ex. 72D.   HARRIS took advantage of A.W.'s naivety, just as he did for the other girls named in the crimes of conviction.

## I.   Other Victims

The forensic exam also revealed well over 275 additional screen names that HARRIS had been talking to online in much the same manner as he had with the named girls in the superseding indictment.   Of those Skype conversations, over 45 girls stated their ages and make clear that they are underage to HARRIS.   Further, as discussed in Sgt. Taylor's testimony at trial and as shown in Government Exhibit 81, HARRIS had approximately 790 images and videos which appear to be girls engaging in sexually explicit conduct on his computer media apart from the named victims. While there is no way to connect the Skype messages with these girls' images and videos, the majority appear to be made the same way HARRIS made the images of the girls in charged crimes: getting them online and then forcing the girls to send these images or making videos himself of the girls on Skype.   While some of these minors have been identified and HARRIS only attempted to extort them for images, others have not been identified despite law enforcement's efforts.

At sentencing, the government will provide additional evidence of these conversations and images through Sgt. Joshua Taylor of the SOVA ICAC.

## J.   Other Relevant Evidence

As shown at trial, it appears that HARRIS has engaged in harassing underage girls since at least 2008.   In 2008, HARRIS' mother forwarded him an e-mail from AOL.   G. Ex. 94.   The e-mail forwarded a complaint that HARRIS' AOL account, "usnalax16," was reported for

sexually harassing a 13 year-old.   *Id.*   HARRIS and his mother both admitted HARRIS utilized

the "usnalax16" account.   Test. of Judy Harris and Defendant.   In the reported conversation,

HARRIS claims to be 15 and tries to get the 13 year-old girl to talk about what she was wearing.

G. Ex. 94.

   While the government does not have any evidence of HARRIS' crimes between 2008 and

2011, as Sgt. Taylor testified at trial, HARRIS upgraded his laptop computer operating system in

2011, so any evidence would have been completely destroyed of earlier conduct on that computer.

**K. HARRIS' Repeated Efforts to Obstruct Justice**

   **1. The Original "John Anderson" Letter**

   In November 2013, on the same day of the search warrant, defendant HARRIS was

arrested by the Bedford County Sheriff's Department for multiple charges of computer solicitation

of a minor and enticement to produce child pornography in violation of Virginia law.   He was

incarcerated prior to trial in in Lynchburg, Virginia.   Test. of Inv. Gary Babb.   HARRIS retained

attorney Andrew Sacks to represent him on those matters.   On or about March 5, 2014, Andrew

Sacks advised the Bedford County Commonwealth Attorney's Office that he received a

handwritten letter from "John Anderson," declaring that he framed defendant HARRIS for the

child pornography charges because "John Anderson" was obsessed with HARRIS' wife.   Test. of

NCIS SA John Sweeney.   The letter was postmarked March 3, 2014, from Baltimore, Maryland.

G. Ex. 126.   In the body of the letter, the writer attempts to lend credence to his confession by, in

addition to other items, supplying the full names of several of the victims and passwords to

different accounts used to perpetrate the charged crimes.   G. Ex. 124.

   Upon receipt of the letter, Andrew Sacks requested that the Bedford County

Commonwealth's Attorney office investigate its origin and forensically evaluate the letter.   Test.

of SA Sweeney.   After revealing the existence of the letter, Mr. Sacks' office turned over the original "John Anderson" letter to the Naval Criminal Investigative Service (NCIS).   *Id.*

Based upon the timing and content of jail house calls between HARRIS and a person HARRIS referred to as "Iceman," it was believed that Iceman was responsible for sending the letter to Mr. Sacks.   Test. of John Sweeney.   NCIS and the Bedford County Sheriff's Office identified "Iceman" as one of HARRIS' friends from his time at the U.S. Naval Academy.   *Id.* Law enforcement believed that "Iceman" received an envelope from HARRIS with the "John Anderson" letter inside it so that said letter could be forwarded to Andrew Sacks without an Inmate Mail stamp or postmark consistent with it being mailed from the jail in Lynchburg.   *Id.*

Based upon those circumstances and beliefs, NCIS located and spoke with "Iceman," a.k.a. Chris Pieczonka, who lived in Maryland.   Test. of SA Sweeney.   Pieczonka testified that he and HARRIS went to the Naval Academy together.   Test. of Chris Pieczonka.   When Pieczonka found out that HARRIS was arrested, he sent a letter to him to tell him he was there to support him. *Id.*   Pieczonka then received an instruction letter from HARRIS, along with another letter enclosed in the same envelope (the "John Anderson" letter), postmarked February 19, 2014, from Roanoke, Virginia.   *Id.*; G. Exs. 122-126.   In the letter to Pieczonka, HARRIS asked Pieczonka to help HARRIS complete a favor he owed someone in jail by mailing the enclosed letter ("no questions asked")(G. Ex. 1124) to Andrew Sacks.   *Id.*   The instruction letter told Iceman:

1) not to read the letter or let anyone know about it,
2) wear gloves when handling the letter,
3) buy new envelopes and stamps with cash to mail the letter (and wipe the stamp to make sure it's clean),
4) remove the outer paper of the letter and put the letter inside, making sure no hair falls inside the envelop
5) seal the envelope with a damp sponge (no tongue or tape),
6) address the envelope in block letters with a pencil as shown on the back of this letter,
7) drive to a certain place and deposit the envelope in a blue post office box,

13

8) forget about doing this, and destroy the instruction letter.

G. Ex. 122.

Pieczonka sent the letter as instructed by HARRIS.   Test. of Pieczonka.

On February 26, 2014, HARRIS called Pieczonka and asked if "everything was good to go," "(s)o everything good to go then?" and whether "everything is good to go?" over the course of several telephone calls.   G. Ex. 133.   HARRIS concluded by saying, "I just wanted to make sure that we were good to go and I'll just be waiting for it and go from there."   *Id.*   Pieczonka responded, "uh-huh, is there anything else you need I can do for you guys?"   *Id.*   HARRIS responds, "No, man, just, uh – just that. That was it."   *Id.*   These telephone calls to Iceman occurred between the original letter being mailed to Pieczonka but before Pieczonka forwarded the letter to Andrew Sacks. *Id* .; Test. of Pieczonka.

At trial, HSI Forensic Document Specialist John Barnett testified that he examined the John Anderson instruction letter.   Test. of HSI Examiner John Barnett.   Examiner Barnett explained that the block lettering of the John Anderson letter itself did not lend itself to comparison to HARRIS' handwriting because he did not have any of HARRIS' block lettering to compare it to.   *Id.*   However, Examiner Barnett was able to compare the instruction letter to known handwriting of HARRIS.   *Id.*; G. Ex. 105.   Examiner Barnett stated that, with the utmost certainty available in his field, HARRIS wrote the John Anderson instruction letter.   *Id.*; G. Exs. 142-143.

## 2.   The "John Anderson" Texting/Inmate Scheme

On Friday, August 15, 2014, several people involved or tangentially involved in the facts surrounding this case received text messages from phone number 757-xxx-xxxx.   Test. of Erin Harris and Pieczonka; G. Exs. 129-130, 132.   The writer of the texts claimed to be "John

14

Anderson."   *Id.*   Specifically, the sender sent texts to Erin Harris, HARRIS' father-in-law, and Pieczonka, among others.   *Id.*   The gist of the texts were that John Anderson had been out of town for some time, but he was back and was going to prove that HARRIS was innocent.   *Id.*

Erin Harris, her father and Pieczonka immediately forwarded the texts to HSI SA Paul Wolpert.   Test. of Erin Harris and Pieczonka.   SA Wolpert and other law enforcement traced the number to a Verizon prepaid phone.   Test. of SA Wolpert.   Law enforcement also reviewed jail calls between HARRIS and his mother.   G. Ex. 156.   On Saturday, August 16, 2014, while talking about the text messages from John Anderson, HARRIS' mother told HARRIS that she also received a strange message that stated "U" from a specific 757 phone number (not the same number as the John Anderson phone number).   *Id.*   SA Wolpert ran the 757 number mentioned by HARRIS' mother on the jail system, and it revealed that it was related to another inmate's (Lloyd Seabolt) jail calls, who was located in the same pod as HARRIS at the Western Tidewater Regional Jail (WTRJ).   Test. of SA Wolpert.   Law enforcement listened to Lloyd Seabolt's jail calls which revealed detailed conversations between Lloyd Seabolt and his wife (Maria Seabolt) about sending texts on behalf of HARRIS to various people.   *Id.*; G. Ex. 134.   Included in those calls was one between Lloyd Seabolt and his wife that occurred after HARRIS spoke to his mother about the mysterious "U" message.   *Id.*   Lloyd Seabolt chastised his wife for accidentally sending a message to HARRIS' mother from her real cell phone and said that HARRIS was very upset.   *Id.*   He told the wife that she probably just put the "nail in the coffin" for HARRIS.   *Id.*

On Sunday, August 17, 2014, SA Wolpert went to the WTRJ and spoke with Lloyd Seabolt.   Test. of SA Wolpert.   Lloyd Seabolt testified that HARRIS was providing canteen money to Lloyd Seabolt and also promised to pay Lloyd Seabolt approximately $3,000 if Lloyd Seabolt's wife sent out various texts to potential witnesses in this matter.   Test. of Lloyd Seabolt.

15

Lloyd Seabolt stated he, at HARRIS' instruction, sent from WTRJ numerous instruction letters written by HARRIS to Lloyd Seabolt's wife which detailed the days on which to send the texts, the phone numbers and the specific messages to include in the messages.   *Id.*; G. Exs. 135A-135F. Lloyd Seabolt's wife did not send the first messages when she was supposed to, but did start sending them on Friday, August 15, 2014.   Test. of Maria Seabolt; G. Ex. 136.   Further, Lloyd Seabolt was due to be released soon.   Test. of Lloyd Seabolt.   Knowing this, HARRIS wrote a lengthy instruction letter that Lloyd Seabolt was to follow upon release that involved opening "John Anderson" e-mail accounts, sending messages to law enforcement and the U.S. Attorney's Office with passwords, usernames, and the like in order to "prove" that John Anderson was the culprit in this matter.   Test. of Lloyd Seabolt; G. Exs. 135A-135F.   The instructions also told Lloyd to go into HARRIS' online accounts, find pictures of the victims , contact and send the pictures to the victims and "prove" that HARRIS was innocent.   *Id.*   Lloyd Seabolt sent this instruction pamphlet to his wife so he could follow it upon his release.   *Id.*

On Monday, August 18, 2014, SA Wolpert retrieved the instruction letters from Lloyd Seabolt's wife.   Test. of SA Wolpert and Maria Seabolt.   There was also a letter from HARRIS to Lloyd Seabolt's wife asking about why the texts did not start on the day they were supposed to start (August 12, 2014).   *Id.*

Law enforcement also discovered that HARRIS attempted to get Kristofer Nelson, another former inmate in HARRIS' pod at WTRJ, to also contact the same people and victims as "John Anderson."   Test. of SA Wolpert and Kristofer Nelson.   Nelson did not do anything to further the plan after he got out of WTRJ but turned over additional instruction letters to SA Wolpert which contemplated the same actions: contact law enforcement and the victims to "prove" that HARRIS was not responsible for the charged crimes.   Test. of Kristofer Nelson; G. Exs. 139A-139F.

16

HARRIS admitted he wrote the instruction letters for the Seabolts and Nelson and that he wanted the text messages sent by Maria Seabolt.   Test. of Harris.   However, he claimed that Nelson and Seabolt stole the letters from his cell at WTRJ and that he only wrote the instruction letters as "venting" sessions and they were in no way instructions.   *Id.*

At trial, Examiner Barnett was able to compare the block lettering of HARRIS' admitted writings to that of the original John Anderson letter.   Test. of Barnett; G. Exs. 144-145. Examiner Barnett confirmed, with the utmost certainty available in his field, HARRIS wrote the John Anderson letter.

### 3.   The Chinese Embassy Letter

On March 26, 2014, after his conviction at trial, HARRIS attempted to mail a letter to the Chinese Embassy in Washington, D.C.   *See* Attachment A.   Knowing that the jail was routinely screening his mailings, HARRIS used another inmate's name on the envelope so that the jail would not screen the letter.   *Id.*   In the letter, HARRIS offered to reveal "all of [his] knowledge" regarding his experience as a U.S. Navy F18 pilot, Top Gun graduate and air-to-air employment expert.   *Id.*   In return, he requested the Chinese Embassy to break him out of jail and drew a map of his location within the jail.   *Id.*   HARRIS states

> My country, that I have faithfully served since 2001, found me guilty of 31 felonies that I did not commit.   And to make it worse they took my wife and children from me.   So if they no longer believe in me, then I no longer believe in them.

*Id.*

HARRIS wrote the letter on the back of U.S. Navy flight schedules, similar to those that were put in evidence at his trial.   Att. A.   He concluded that he will contact the Russian Embassy if he did not hear from the Chinese by April 3rd.   *Id.*

17

At sentencing, the government will present evidence from HSI Forensic Document Examiner John Barnett.   Examiner Barnett will confirm that this letter was written by HARRIS.

## II.   DEFENDANT'S OBJECTIONS

Defendant maintains his innocence and objects to the factual allegations made in the PSR. As the jury determined in March 2015, and as briefly described above, there was enough evidence to convict HARRIS beyond a reasonable doubt on all counts.   The government will present further evidence at sentencing, as described above, concerning defendant's objections regarding D.C. and "other victims" evidence.

HARRIS objects to the inclusion of the 2008 AOL e-mail in the relevant conduct.   As litigated at trial, the 2008 AOL e-mail was properly admitted for the jury's consideration concerning identity.   The information is also fully relevant to the Court's sentencing consideration in terms of the length of time HARRIS has been perpetrating these types of crimes.

HARRIS' objections re: the Chinese Embassy letter should also be overruled by the Court. The Court must look at the defendant's characteristics and well as protection of society. HARRIS' continued obstinacy and delusions, along with his continued attempt to break the law, is relevant to the Court's sentencing considerations.   Further, HARRIS has made, and will likely continue to tout, his military career as "reason number one" he was incapable of these crimes and reason for a variant sentence.   HARRIS had a parade of military witnesses at trial to try to support his character as an outstanding Navy officer.   His attempts to continue to break the law, undermine our nation's security and avoid punishment at all costs is something this Court should take seriously in determining an appropriate sentence of imprisonment for HARRIS.

The government reserves further response to defendant's objections should HARRIS be more specific in his position on sentencing as to the basis of those objections other than "factual innocence."

### III.   HARASSMENT OF MINORS

Since the verdict in this matter and because of HARRIS' continued attempts to thwart the law, law enforcement has been continuing to monitor his jail calls and mail.   HARRIS has made and continues to make repeated requests of his family and attorney to contact K.E., the minor with whom HARRIS was communicating with the morning of the search warrant at his residence in Virginia Beach.   HARRIS is continuing to try to prove his innocence and K.E. is someone he believes can help in that matter.

While the Court routinely orders no contact with minors as part of supervised release for sex offenders such as HARRIS, the government requests the Court order that the defendant have no contact with minors (or cause through others contact with minors ) while in the custody of the Bureau of Prisons.   While K.E. is not a named victim in this case, the government submits that such an order is reasonable and appropriate considering HARRIS' continued behavior and the risk he presents to minors.

### IV.   STANDARDS GOVERNING SENTENCING

In three recent opinions, the Supreme Court pronounced a new sentencing regime.   In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, but emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision.   *Id.* at 264. The Supreme Court reaffirmed this principle in *United States v. Kimbrough*, 128 S. Ct. 558 (2007), emphasizing that "the Guidelines, formerly mandatory, now serve as one factor among several

19

courts must consider in determining an appropriate sentence." *Id.* at 564. Finally, in *Gall v. United States*, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the Sentencing Guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. *Id.* at 596-97. The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that a "major departure should be supported by a more significant justification than a minor one."). Applying these standards, the Fourth Circuit has concluded that a sentencing court must: "(1) properly calculate the Guideline range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence." *United States v. Simmons*, 269 Fed. App'x 272 at *1 (4th Cir. 2008) (*citing United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)).

## V.   FACTORS UNDER 18 U.S.C. § 3553(a)

Under 18 U.S.C. § 3553(a), when imposing a sentence, the Court should consider the nature and circumstances of the offense as well as the history and characteristics of the defendant. The Court should impose a sentence that reflects the seriousness of the offense, and the need to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes, and to provide the defendant with adequate rehabilitation or medical treatment.

A.      **Nature and Circumstances of the Offense**

Blackmail and extortion are abhorrent crimes.   Somehow, though, HARRIS found a way to go even beyond abhorrent behavior and commit unspeakable, unfathomable crimes involving young, impressionable girls.

The defendant engaged in the serial sexual exploitation and extortion of numerous girls over the course of several years (that we know of with certainty).   The defendant manipulated the girls he targeted during this long time period, often by using the Internet to identify their names, schools and friends.   He then coerced and extorted them to produce additional child pornography for his benefit, frequently demanding especially embarrassing and degrading sexual conduct.

In this case, the Court is afforded an unusually high degree of insight into the nature and circumstances of the defendant's offenses and the history and characteristics of the defendant. The Court can actually see in the defendant's chat texts and e-mails his callous, despicable treatment of girls over the course of his sexual exploitation and extortion scheme.   HARRIS' depraved indifference to the suffering he caused was so severe that when victim H.K. told him that his threats were going to cause her to kill herself, he told her to hurry up and do what he wanted. And, in the "reflection" video involving H.K., when H.K. breaks down crying, you see HARRIS bite his lip in pleasure.   When D.C. begged for HARRIS to stop because it was worse than when she was raped, HARRIS did not stop.   He did not hesitate- this control and misery was what he craved.

The defendant may point out that HARRIS never actually "touched" a girl in person. Here, there is no difference between being in person and making these girls do these perverted things to themselves.   HARRIS manipulated these girls into abusing themselves for his pleasure- he made them participate in their own victimization.   He had them think that they had no choice

21

and had them do demeaning things that they would never have engaged in without being unfortunate enough to talk to HARRIS, who they thought was a cute, high school boy who said the girls were beautiful.

Physical and sexual trauma and abuse of children, when combined with a psychological element of abuse, is extremely dangerous.

> Psychological maltreatment that occurred alongside physical or sexual abuse was associated with significantly more severe and far-ranging negative outcomes than when children were sexually and physically abused and not psychologically abused, the study found.   Moreover, sexual and physical abuse had to occur at the same time to have the same effect as psychological abuse alone on behavioral issues at school, attachment problems and self-injurious behaviors, the research found."

*Childhood Psychological Abuse as Harmful as Sexual or Physical Abuse*, American Psychological Ass'n (http://www.apa.org/news/press/releases/2014/10/psychological- abuse.aspx).

While these girls may blame themselves for having accepted HARRIS as a "friend" online or even flirting a bit at first, HARRIS' psychological manipulation makes things even worse. However, there was no one responsible for this abuse except HARRIS.

For teenage girls, for better or worse, their lives are plugged into and part of the Internet. The threats that HARRIS made to them- to go to their parents or schools with embarrassing pictures- was as good as death to them.   As the Court will hear from several victims, they wanted to kill themselves, and one event attempted to do so.   HARRIS' crimes made them want to kill themselves.   Is this the victims' fault?   No.   They honestly felt that they had no choice. HARRIS and HARRIS alone did this to them.   The fact that HARRIS used the Internet for these crimes made no difference in the effect it had on the victims.

Many girls and families' lives have been forever changed because HARRIS has absolutely no regard for anyone but himself and his pernicious need to control and manipulate.   The Court's sentence must take this into consideration in its fashioning of a sentence.

## B.   Defendant's Criminal History

The government submits that the defendant's criminal history is underrepresented.   On paper, the defendant was a model citizen.   But, HARRIS lived a double life and had been for some time.   The trial only dealt with nine victims, but the evidence shows that HARRIS had manipulated many, many more than that over a period of years.   None of this lengthy behavior and other victims are considered in his criminal history.   Neither is his continued attempt to avoid punishment for his crimes, such as the contacting the Chinese embassy.

## C.   Need to Deter Future Criminal Conduct and to Protect the Public

Defendant's sentence needs to accomplish the twin goals of deterring the defendant from engaging in future criminal conduct and to protect the public.   HARRIS has shown that he is the epitome of the type of person from which the public needs to be protected.   HARRIS was so clever and manipulative that he went for years before one young lady actually told on him to her parents.   HARRIS was so clever and manipulative that everyone around him, both professionally and personally, had no idea of his repeated sexual abuse of girls.   Based on his actions after his arrest and post-trial, HARRIS continues to believe that if he is clever and manipulative enough, he can still get out of trouble.

The government submits that, based on HARRIS' criminal past, nothing would have stopped HARRIS short of his arrest.   The government also submits that, based on HARRIS' refusal to accept any responsibility and his continuous attempts to deflect the truth, HARRIS' likelihood to return to manipulative, destructive behavior is strong.   Even after "John

Anderson" was originally discovered to be HARRIS, HARRIS had the gall to try to manipulate needy fellow inmates to try to further the "John Anderson" myth.   HARRIS wanted these inmates to find sexually explicit images of the victims, send them to the victims, and try to dissuade the victims from testifying against him.   HARRIS then got on the stand and lied for almost two full days, trying to be clever and manipulate a jury into believing his fabrications and delusions.   Even after the guilty verdict, HARRIS then tried to be clever and manipulate his way out of jail by trying to give national secrets to the Chinese.

The government does not believe that HARRIS is able to control himself .   Further, he still refuses to accept responsibility for his actions, which does not bode well for any rehabilitation chances.   The government avers that HARRIS will continue to use and abuse others should he have any chance to do so.   Due to this risk, adequate punishment, deterrence and protection of the public all call for a severe sentence for HARRIS' offenses.   18 U.S.C. § 3553(a)(2).

**D.   Need to Provide Treatment to Defendant**

Due to the nature and duration of the defendant's crimes, defendant should be ordered to participate in a sex offender and mental health treatment program while incarcerated.

**E.     Need to Avoid Unwarranted Sentencing Disparities**

DANIEL CHASE HARRIS's actions related to the crimes of conviction and other relevant conduct support a severe sentence of imprisonment.   While our district has not seen too many "sextortion" cases, it is a rising crime reaching epidemic proportions.   *See, e.g. "Sextortion is an Online Epidemic Against Children*, USA Today, July 1, 2014 (http://www.usatoday.com/ story/news/nation/2014/07/01/sextortion-teens-online/11580633/).   However, similarly situated defendants in our Court are given lengthy sentences for production of child pornography involving

24

many less victims even with acceptance of responsibility and without obstruction of justice.   For

example:

| Case Name/Number | No. of Victims | Plea/Trial | Sentence |
|---|---|---|---|
| U.S. v. Roberto Darden 4:11cr52 | 1 (13 years-old) | Plea to Production of Child Pornography | 720 months |
| U.S. v. John Scott 2:13cr14 | 3 (10-14 years-old | Plea to Production of Child Pornography | 600 months |
| U.S. v. Michael Sechrist 2:13cr30 | 1 (7 years-old) | Plea to Production of Child Pornography | 327 months |
| U.S. v. Abimael Cardenales 2:12cr2 | 2 (10-15 years-old) | Plea to Production of Child Pornography | 720 months |
| U.S. v. Robert Harold Scott 2:13cr164 | 7 (1 to 5 years-old) ( no hands on contact, all through the Internet) | Trial- Production of Child Pornography, Enticement, Obstruction | Life |
| U.S. v. Scottie Lee Martinez 2:10cr122 | 3 (ages 5-14 years-old) | Plea to Production of Child Pornography | 960 months |

Granted, as with all cases, each of these examples have different circumstances and

different individual defendants.   However, the defendant's punishment should be no less severe

simply because he found a quick way to abuse more victims using the Internet.   The effects are the

same, as should the punishment.

## VI. CONCLUSION

For the reasons stated above, the government asks the Court to impose a sentence of imprisonment of at least 50 years and lifetime supervised release.

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _____/s/_____
Elizabeth M. Yusi
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number:   757-441-6331
Facsimile Number: 757-441-6689
E-Mail Address: elizabeth.yusi@usdoj.gov

26

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 6, 2015, I electronically filed a copy of the foregoing with the Clerk

of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the

following:

Andrew Sacks, Esq.
150 Boush Street, Suite 501
Norfolk, VA 23510

I further certify that on July 6, 2015, I caused a true and correct copy of the foregoing to

be sent to the following:

Jason Cole
United States Probation Officer
600 Granby Street
Norfolk, VA 23510


               /s/
Elizabeth M. Yusi
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Phone: 757-441-6331
Fax: 757-441-6689
E-mail: elizabeth.yusi@usdoj.gov

27