IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

DANIEL CHASE HARRIS,

      Movant,

v.

                                    Crim. Action No. 2:14cr76
                                    Civil Action No. 2:18cv_____

UNITED STATES OF AMERICA,

      Respondent.

## MOTION TO VACATE, SET ASIDE, OR CORRECT ILLEGAL SENTENCE
## <u>PURSUANT TO 28 U.S.C. § 2255</u>

NOW COMES Movant, Daniel Chase Harris, by and through his counsel, James R. Theuer, PLLC, and the Law Office of Steven W. Becker LLC,[1] and submits the following motion to vacate, set aside, or correct illegal sentence pursuant to 28 U.S.C. § 2255.[2]

The Movant respectfully moves for discovery and for an evidentiary hearing to provide the Court with additional information on the claims asserted.

The Movant further moves for leave to file a formal memorandum of law in reply to any Answer submitted by the Respondent.

---

[1] Admission *pro hac vice* pending.

[2] Local Rule 83.4(A) provides that motions in collateral proceedings filed by counsel need not utilize the standardized form; however, the present motion contains essentially the same information as that requested in the standardized form provided by the Clerk's Office pursuant to Rule 2(c) of the Rules Governing Section 2255 Proceedings for the United States District Courts.

## Information Concerning Movant

The Movant is Daniel Chase Harris.  He is currently housed at USP Terre
Haute, P.O. Box 33, Terre Haute, Indiana 47808.  His Register Number is 84142-
083.

1.  (a) *Name and location of court where judgment of conviction entered:*

    The court that entered the judgment of conviction is the United States
    District Court for the Eastern District of Virginia, Norfolk Division.  The
    court is located in Norfolk, Virginia.

    (b) *Criminal docket number:*

    No. 2:14cr76.

2.  (a) *Date of judgment of conviction:*

    The jury convicted the Movant on March 9, 2015.

    (b) *Date of sentence:*

    The Movant was sentenced on July 13, 2015.  The Judgment was issued on
    July 15, 2015.

3.  *Length of Sentence:*

    The Movant was sentenced to 600 months' imprisonment.

4.  *Nature of crime (all counts):*

    Counts 1 through 13 of the Superseding Indictment charged the Movant with
    Production of Child Pornography.  Counts 14 through 19 charged the Movant
    with Use of a Facility of Interstate Commerce to Entice a Minor to Engage in
    Criminal Sexual Activity.  Counts 20 through 26 charged the Movant with

Receipt of Child Pornography.  Counts 27 and 28 charged the Movant with Transportation of Child Pornography.  Counts 29 and 30 charged the Movant with Possession of Child Pornography.  Counts 31 and 32 charged the Movant with Obstruction of Justice.

The Movant was convicted of Counts 1 through 29, 31, and 32.  Count 30 was dismissed.

5. *Nature of Plea:*

The Movant pled not guilty.

6. *Nature of Trial:*

The Movant had a jury trial.

7. *Testimony of the defendant:*

The Movant testified at trial on his own behalf.

8. *Appeal from the conviction:*

Yes, the Movant filed a timely notice of appeal on July 27, 2015.

9. *Details regarding direct appeal:*

(a) *Name of court:*

United States Court of Appeals for the Fourth Circuit.

(b) *Docket or case number:*

No. 15-4451.

(c) *Result:*

Conviction and sentence affirmed.

(d) *Date of result:*

June 28, 2016.

(e) *Citation to the case:*

*United States v. Harris*, No. 15-4451, 653 Fed. Appx. 203 (4th Cir. June

28 2016).

(f) *Grounds raised:*

The appeal raised two issues: (1) the trial court erred in failing to grant a

motion for judgment of acquittal on two counts based upon insufficient

evidence; and (2) the substantive reasonableness of the sentence.

(g) *Petition for writ of* certiorari:

Yes, the Movant filed a petition for writ of *certiorari*.

(1) *Docket or case number:*

No. 16-7872.

(2) *Result:*

Petition denied.

(3) *Date of Result:*

March 20, 2017.

(4) *Citation to the case:*

*Harris v. United States*, 137 S. Ct. 1355 (2017).

(5) *Grounds raised:*

The petition raised two issues: (1) a challenge to the substantive

reasonableness of the sentence and constitutionality of the Sentencing

Guidelines' application; and (2) that Movant should have been tried in

a military court instead of a federal court because the overwhelming

amount of evidence was military in nature and a civilian jury was not

capable of understanding it.

10. *Filings challenging the judgment of conviction other than a direct appeal:*

None.

11. *If your answer to Question 10 was "Yes," please provide additional details:*

Not applicable.

12. *Grounds for relief:*

## GROUND ONE

I.   **The District Court Lacked Jurisdiction to Enter Judgment and Impose Sentence on Count Fourteen of the Superseding Indictment Under the Military Extraterritorial Jurisdiction Act.**

(a) *Direct Appeal of Ground One:*

(1) *Was this issue raised on direct appeal?*

No.

(2) *Why was the issue not raised on direct appeal?*

Ineffective assistance of appellate counsel.  Additionally, jurisdictional

issues may be raised at any time.

(b) *Previous Post-Conviction Proceedings regarding Ground One:*

Not applicable.

(c) *Relevant facts and discussion:*

One of the issues a movant may raise in a motion to vacate sentence

pursuant to 28 U.S.C. § 2255 is whether "the court lacked jurisdiction to enter the

judgment."  Rule 1(a)(2), Rules Governing Section 2255 Proceedings for the United

States District Courts.  *See* 28 U.S.C. § 2255(a) (providing that § 2255 motion may be based on ground that "the court was without jurisdiction to impose such sentence").

In the instant case, the district court lacked jurisdiction to enter judgment and impose sentence on Count Fourteen of the Superseding Indictment against the Movant under the Military Extraterritorial Jurisdiction Act of 2000 (MEJA), 18 U.S.C. § 3261 et seq.  Because the Movant was a member of the Armed Forces subject to the Uniform Code of Military Justice (UCMJ) and the indictment did not allege that the Movant committed the offense with a co-defendant who was not subject to the UCMJ, the district court lacked jurisdiction over the Movant.  *See* 18 U.S.C. § 3261(d).  Accordingly, the Movant should be entitled to an evidentiary hearing, his conviction on Count Fourteen should be vacated, and the Movant should further be afforded the various forms of relief detailed below.

Superseding Indictment

Count Fourteen charges that:

From on or about March 19, 2011, to on or about October 8, 2011, beginning at Naval Air Facility Atsugi (Japan) in the Special Maritime and Territorial Jurisdiction of the United States, and continuing in the Eastern District of Virginia, and elsewhere, the defendant DANIEL CHASE HARRIS, used a facility and means of interstate and foreign commerce to attempt to and did knowingly persuade, induce, entice, and coerce H.K., who had not

attained the age of 18 years, to engage in a sexual activity for which a person

can be charged with a criminal offense under Virginia law, namely,

Production of Child Pornography, in violation of § 18.2-374.1 of the Virginia

Code.

(In violation of Title 18, United States Code, Sections 2422(b) and (7))

(R. 44)[3]

Pertinent Statutes Relating to Jurisdiction

Count Fourteen specifically cites to 18 U.S.C. § 7, which defines the term

"special maritime and territorial jurisdiction of the United States." *See* 18 U.S.C. §

7(1)-(9). Subsection (9) provides that, "[w]ith respect to offenses committed by . . . a

national of the United States," special maritime and territorial jurisdiction of the

United States includes:

(A)    the premises of United States diplomatic, consular, military or other

United States Government missions or entities in foreign States, including

the buildings, parts of buildings, and land appurtenant or ancillary thereto or

used for purposes of those missions or entities, irrespective of ownership; and

(B)    residences in foreign States and the land appurtenant or ancillary

thereto, irrespective of ownership, used for purposes of those missions or

entities or used by United States personnel assigned to those missions or

---

[3] "R." refers to the Record on Appeal.

entities.

18 U.S.C. § 7(9)(A), (B).

Subsection (9), however, contains an important proviso in its concluding sentence: "This paragraph does not apply with respect to an offense committed by a person described in section 3261(a) of this title [18 U.S.C. § 3261(a)]."  18 U.S.C. § 7(9).

In turn, 18 U.S.C. § 3261(a) describes two categories of persons:

(a) Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States –

(1) While employed by or accompanying the Armed Forces outside the United States; or

(2) While a member of the Armed Forces subject to chapter 47 of title 10 [10 U.S.C. §§ 801 et seq.],

shall be punished as provided for that offense.

18 U.S.C. § 3261(a).

Yet, of direct relevance to the instant issue, subsection (d) of § 3261 provides:

No prosecution may be commenced against a member of the Armed Forces

subject to chapter 47 of title 10 [10 U.S.C. §§ 801 et seq.] (the Uniform Code of Military Justice) under this section unless –

(1)     Such member ceases to be subject to such chapter; or

(2)     An indictment or information charges that the member committed the offense with one or more other defendants, at least one of whom is not subject to such chapter.

18 U.S.C. § 3261(d).

In summary, pursuant to 18 U.S.C. § 7(9), a "national of the United States," who is defined, *inter alia*, as "a citizen of the United States," 8 U.S.C. § 1101(a)(22)(A), generally falls within the "special maritime and extraterritorial jurisdiction of the United States" where his offense is committed, for example, on a military base, <u>unless</u> the offense is committed by a person described in 18 U.S.C. § 3261(a).

Turning then to § 3261(a) of MEJA, a member of the Armed Forces subject to the UCMJ who commits an offense punishable by more than one year in prison if the conduct had been engaged in within the special maritime and extraterritorial jurisdiction of the United States qualifies as a person falling within 18 U.S.C. § 7(9)'s exception.  *See* 18 U.S.C. § 3261(a).  Yet, under MEJA, no prosecution against a member of the Armed Forces may be commenced in a civilian court for such an offense <u>unless</u> the member ceases to be subject to the UCMJ or he is alleged to have committed the offense with a codefendant who is not subject to the UCMJ.

18 U.S.C. § 3261(d).

Construing the two statutes *in pari materia*, a member of the Armed Forces subject to the UCMJ who is not charged with having committed the offense with a codefendant not subject to the UCMJ neither falls within the special maritime and extraterritorial jurisdiction of the United States under 18 U.S.C. § 7, nor can he be tried for the offense by a civilian court.  18 U.S.C. § 3261(d).

As explicitly stated by one court, "MEJA's text indicates that servicemen and women who commit crimes while on active duty are to be prosecuted under the UCMJ; indeed, 18 U.S.C. § 3261(d) specifically prohibits the use of MEJA to try active duty service personnel who are subject to court-martial, unless the serviceman or servicewoman committed the crime with someone who was not subject to UCMJ jurisdiction."  *United States v. Santiago*, 966 F. Supp. 2d 247, 255 (S.D.N.Y. 2013).

MEJA's legislative history likewise makes this clear: "Subsection (d) limits prosecutions under the new section 3261 against persons who, at the time they committed the crime, were members of the Armed Forces.  The committee recognizes that the military has the predominant interest in disciplining its members and subsection (d) enacts the general preference that military members be tried by court-martial for their crimes."  H.R. REP. NO. 106-778(1) (2000).  Moreover, the UNITED STATES ATTORNEYS' MANUAL itself, in discussing statutory limitations on prosecutions under MEJA, states that "[p]rosecution is further prohibited

against a member of the Armed Forces unless the offender subsequently ceases to be subject to the UCMJ or is charged with one or more codefendants not subject to the UCMJ (*see* 18 U.S.C. § 3261(d))." U.S. ATTORNEYS' MANUAL § 9-20.116(B).

This court previously reviewed a MEJA claim in *United States v. Holmes*, 699 F. Supp. 2d 818 (E.D. Va. 2010) (Davis, J.), *aff'd*, 670 F.3d 586 (4th Cir. 2012), albeit in a slightly different context. In *Holmes*, the defendant, an active duty member of the Air Force, was alleged to have sexually assaulted his step-daughter during the time he was stationed at Yokota Air Base, a United States military installation in Japan. *Id.* at 822. Following court-martial proceedings, which ended in a voluntary dismissal of the court-martial, the defendant was indicted in Newport News with aggravated sexual abuse of a child, in violation of 18 U.S.C. §§ 2241 and 7. *Id.* at 823-24. "Not long thereafter, the Government moved to dismiss the First Indictment, ostensibly upon realizing that it was precluded from prosecuting Defendant because he was still a member of the armed forces, and thus subject to the UCMJ." *Id.* at 824. *See Holmes*, 670 F.3d at 589 n.1 ("It appears from the Government's motion to dismiss the first indictment that the district court lacked jurisdiction because Holmes was still an active member of the Air Force."). Subsequently, the defendant was discharged from the Air Force. *Holmes*, 699 F. Supp. 2d at 824. Following the dismissal of a second indictment and upon the issuance of a third indictment, the defendant moved to dismiss the third indictment, *inter alia*, on the ground that the court lacked jurisdiction to try him according to 18 U.S.C. §§ 2241 and 7, and contended that charges could only be

11

brought against him under MEJA.  *Id.* at 824-25.

Although this Court did not have occasion to address the defendant's MEJA claim on the merits, it pointed out that "MEJA did not go into effect until November 22, 2000, and prior to that time such crimes would be prosecuted under the extraterritorial jurisdiction statutes, such as 18 U.S.C. §§ 2241 and 7."  *Id.* at 831. Because the Court found that, under the facts alleged, the defendant's alleged sexual misconduct could have occurred prior to the date of MEJA's enactment, the Court ruled that MEJA was inapplicable, as it could not be applied retroactively. *Id.*

Facts Relating to Movant's Case

In contrast to *Holmes*, however, MEJA was in full force and effect when the Movant herein, an active duty member of the United States Navy (R. 1704-1705), was alleged to have committed the offenses described in Count Fourteen.

Moreover, unlike the defendant in *Holmes*, who was discharged from the Air Force prior to the issuance of the third indictment against him – and thus no longer subject to the UCMJ, the Movant in the instant matter was still a member of the Navy and subject to the UCMJ at the time the Superseding Indictment was issued against him on September 17, 2014, in the present case.  (R. 10)  *See Harris v. United States*, Case No. 16-560 C, 2017 U.S. Claims LEXIS 83, *2 (Fed. Ct. Cl. Feb. 9, 2017) (memorializing that, as of February 2017, Lieutenant Harris "has not yet been discharged" from the United States Navy), *aff'd*, 868 F.3d 1376 (Fed. Cir.

2017).

Furthermore, the Movant was not alleged in the indictment to have perpetrated the offenses with a co-defendant who was not subject to the UCMJ.

For all these reasons, pursuant to 18 U.S.C. § 3261(d) of MEJA, the Court lacked jurisdiction to enter judgment against and to impose sentence upon the Movant on Count Fourteen, as the Movant was on active duty at the time of the alleged offenses occurring in Japan, the Movant was subject to the UCMJ at the time of the Superseding Indictment, and the Movant was not alleged to have committed the offenses with a co-defendant who was not subject to the UCMJ.

Additionally, although Count Fourteen was the only count under which the government formally charged the Movant with offenses occurring in "the Special Maritime and Territorial Jurisdiction of the United States," Count One of the Superseding Indictment, which likewise involved H.K., specifically involved the making and transportation of a visual depiction "from outside of the United States into the Eastern District of Virginia" (R. 31). (R. 28, 31 (alleging that the visual depiction was made "on or about May 3, 2011," and that Movant was stationed overseas at the time)). Therefore, to the extent that the indictment and the government's proofs relied upon conduct occurring in the special maritime and territorial jurisdiction of the United States vis-à-vis H.K., as detailed in Count Fourteen, Count One should likewise be dismissed for lack of jurisdiction.

Finally, as this Court itself has recently iterated, lack of subject-matter

13

jurisdiction can never be forfeited, a federal court has an independent obligation to assess its subject-matter jurisdiction, and an absence of such jurisdiction can be raised at any time.  *See Earl v. Norfolk State Univ.*, Case No. 2:13cv148, 2014 U.S. Dist. LEXIS 88652, *18-*19 (E.D. Va. June 26, 2014) (Davis, J.) (unpublished).

Jurisdictional defects provide independent grounds upon which to assert a § 2255 claim, *see* 28 U.S.C. § 2255(a); however, alternatively, trial counsel was ineffective in failing to move to dismiss Count Fourteen (and Count One), and appellate counsel on direct appeal was ineffective for failing to assert trial counsel's ineffectiveness in this regard.

Under the United States Constitution, an accused has a due process right to the effective assistance of counsel in a criminal prosecution.  U.S. CONST. amends. VI, XIV.  A defendant is denied effective assistance of counsel where his attorney's performance falls below an objective standard of reasonable representation, and there is a reasonable probability that the outcome of the proceedings would have been different but for the attorney's inadequate performance.  *Strickland v. Washington*, 466 U.S. 668, 687-88, 692-94 (1984).  Under the prejudice prong of the *Strickland* test, a reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair.  *Id.* at 694.

Herein, trial counsel's performance was deficient in failing to move to dismiss Count Fourteen on jurisdictional grounds, as detailed above.  The failure to do so in

this case is particularly troubling because Movant's trial counsel served as appellate counsel in *United States v. Holmes*, 670 F.3d 586 (4th Cir. 2012), in which this precise argument featured prominently in the judgment being appealed from and thus should have been within counsel's personal scope of legal knowledge.

Secondly, trial counsel's deficient performance was prejudicial in that the Movant should not have been convicted or sentenced on Count Fourteen, nor should the jury ever have been exposed to such evidence – indisputably, among the most damaging evidence in the entire case.

Similarly, appellate counsel was ineffective in failing to assert trial counsel's ineffectiveness in this regard.  His performance was deficient and prejudicial for the same reasons.

Accordingly, this Court should grant an evidentiary hearing, after which the Court should vacate the Movant's conviction on Count Fourteen, as well as on Count One, following which the Court should hold a hearing to assess the prejudicial impact of the evidence introduced in connection with these counts to determine whether a new trial is warranted on the remaining counts as a result of its cumulative prejudicial effect, order a new trial on the remaining counts, or vacate Movant's sentence in its entirety and order a resentencing hearing.

## GROUND TWO

**II.   Appellate Counsel was Ineffective for Failing to Raise on Direct Appeal the District Court's Procedural Error of Mistake of Fact that the Movant "Raped [the Complainants]."**

(a) *Direct Appeal of Ground Two:*

    (1) *Was this issue raised on direct appeal?*

       No.

    (2) *Why was the issue not raised on direct appeal?*

       Ineffective assistance of appellate counsel.

(b) *Previous Post-Conviction Proceedings regarding Ground Two:*

    Not applicable.

(c) *Relevant facts and discussion:*

Appellate counsel was ineffective for failing to raise on direct appeal the district court's mistake of fact that the Movant "raped [the complainants]" in challenging the procedural reasonableness of the Movant's sentence.

On direct appeal, appellate counsel conceded that the district court did not err in calculating the advisory Guidelines range but instead challenged only that the sentence was substantively unreasonable. *See United States v. Harris*, Case No. 15-4451, 653 Fed. Appx. 203, 204 (4th Cir. June 28, 2016) (unpublished).

A reviewing court, however, will not uphold a sentence as being substantively reasonable until it first concludes that the district court adhered to the necessary procedural requirements. *See United States v. Dendy*, Case No. 10-4260, 438 Fed. Appx. 210, 213 (4th Cir. July 14, 2011) (unpublished).  Such procedural errors may

include a miscalculation of the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553 factors, or "selecting a sentence based on clearly erroneous facts." *Gall v. United States*, 552 U.S. 38, 51 (2007).

Sentencing decisions may not be made upon mistakes of fact or misinformation of a constitutional magnitude. *United States v. Powell*, 487 F.2d 325, 328 (4th Cir. 1973). "[I]t is hard to imagine how a sentence could ever be deemed fair when there is some way to verify the sentencing court's error externally (whether an error of fact or an error of law) and when that error caused the misguided sentence." *United States v. Eakman*, 378 F.3d 294, 300-01 (3d Cir. 2004). Because objectively ascertainable errors that a sentencing court has materially relied upon will always be of "constitutional magnitude," the appropriate test inquires whether (1) the district court made an objectively ascertainable error; and (2) the district court materially relied on that error in determining the appropriate sentence. *Id.* at 301. "If the answer to both questions is 'yes,' then – unless the record conclusively shows that the prisoner is not entitled to relief – the prisoner is entitled to a hearing." *Id.*

In *United States v. Cobler*, 748 F.3d 570 (4th Cir. 2014), the Fourth Circuit addressed a claim of procedural error strikingly similar to the one raised in the instant motion. In *Cobler*, the defendant alleged that, in the district court's "statement of reasons" for imposing sentence, the judge relied upon an erroneous fact, viz., that defendant recorded the "rape" of his four-year-old victim. *Id.* at 581. Based upon the defendant's admissions to the police investigators, however, the

17

Fourth Circuit rejected the contention that the district court erred in characterizing defendant's sexual conduct with the child as "rape." *Id.* Specifically, in *Cobler*, the defendant confessed that he had sexually molested a four-year-old boy on four separate occasions while acting as the child's babysitter and had photographed and filmed the sexual encounters. *Id.* at 574. Additionally, Cobler, who was afflicted with a serious communicable disease, admitted that at the time he physically molested the child, he was aware that his disease could be transmitted to the child by sexual contact. *Id.*

## Facts Relating to Movant's Case

In the present case, the Court, during its statement of reasons for imposing sentence, told the Movant, "You essentially raped [the complainants]." (R. 2781) Yet, in stark contrast to *Cobler*, there was no evidence introduced at the trial that the Movant ever had any physical contact whatsoever with a single one of the teenagers who testified against him, let alone that he even met one of these girls in person – a fact that the Court seemed to earlier concede. (R. 2780) By definition of law, however, one cannot commit "rape" in Virginia without physical penetration. *See Coles v. Peyton*, 389 F.2d 224, 227 (4th Cir. 1968) (holding that, under Virginia law, penetration is an essential element of rape and, without proof of penetration, the substantive crime could not have been committed); *Moore v. Commonwealth*, 254 Va. 184, 186 (1997) (noting that penetration "is an essential element of the crime of rape"); Va. Code Ann. 18.2-61(A).

18

Furthermore, after declaring that the Movant "raped them" (R. 2781), the Court went one step further and described the Movant's digital interaction with the teenagers as being "even worse" than rape (R. 2781), suggesting that a physical sexual assault would have been less-traumatizing: "It wasn't as if there was some in-person sexual abuse that then allowed the child to go, you know, to go and be healed."  (R. 2781)

Based upon the Court's sentencing remarks detailed above, the Court erroneously characterized the Movant's digital offenses as "rape[ ]," despite the fact that there was no physical penetration proven or even alleged.  This directly distinguishes the instant case from *Cobler*, where the Fourth Circuit ruled that the district judge's characterization of the defendant's offenses as "rape" did not constitute a "significant procedural error" because the defendant confessed to having physically sexually assaulted the baby in his care, thereby potentially passing on to the toddler the defendant's serious communicable disease.  *Cobler*, 748 F.3d at 581, 582.

As such, the Court in the present case (1) made an objectively ascertainable error in characterizing the Movant's offenses as "rape[s]" in the absence of any physical penetration; and (2) materially relied upon such error in determining the appropriate sentence, as evidenced by the Court's reference to the gravity of the Movant's repeated offenses as being "even worse" than rape.  (R. 2781)  Because such a procedural error necessarily rises to the level of an error of "constitutional magnitude," *Eakman*, 378 F.3d at 301, the underlying sentence cannot be upheld as

substantively reasonable.  *See Dendy*, 438 Fed. Appx. at 213.  Accordingly, the Movant is entitled to an evidentiary hearing.  *Eakman*, 378 F.3d at 301.  *Cf. United States v. Juwa*, 508 F.3d 694, 699 (2d Cir. 2007) (remanding for resentencing where there was "uncertainty from both the sentencing transcript and the written order surrounding whether and to what extent the district judge based his sentencing enhancement on the assumption that Juwa had engaged in multiple instances of sexual abuse, as opposed to the single instance to which Juwa had anticipated pleading guilty in state court"); *United States v. Cossey*, 632 F.3d 82, 88-89 (2d Cir. 2011) (remanding for resentencing where it was unclear whether district court sentenced defendant based on an appropriate or inappropriate consideration).

Because the procedural error noted above occurred during the Court's statement of reasons for sentence, there is a question as to whether trial counsel was obligated to interpose an objection in order to preserve the issue for appellate review.  In such a context, the plain error doctrine is often relaxed because the conduct of the judge is at issue and an objection would have little practical effect. *See United States v. McCrimon*, 788 F.3d 75, 78 (2d Cir. 2015) ("The plain error doctrine should not be applied stringently in the sentencing context, where the cost of correcting an unpreserved error is not as great as in the trial context."). Therefore, the failure to object to a judge's individual sentencing comments would likely not be considered as constituting forfeiture.  *Id.*

To the extent that an objection was required, however, trial counsel was ineffective for failing to interpose a timely objection and appellate counsel was

likewise ineffective for failing to allege trial counsel's ineffectiveness in this regard. *See Strickland*, 466 U.S. at 687-88, 692-94.

In any event, appellate counsel on direct appeal was ineffective for failing to assert that the Court's aforementioned procedural error of mistake of fact at sentencing was reversible error or, alternatively, if forfeited, was plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Marcus*, 560 U.S. 258, 262 (2010).

In this regard, under *Strickland*, appellate counsel's performance fell below an objective standard of reasonable representation because, although appellate counsel challenged the substantive reasonableness of the 600-month sentence imposed upon the Movant, appellate counsel failed to first raise the significant procedural error of mistake of fact detailed above. Because an examination of procedural reasonableness must always precede a challenge to substantive reasonableness – as an error in the former can ultimately generate a misguided overall sentence – appellate counsel's failure to assert this procedural error constituted deficient performance.

Secondly, appellate counsel's deficient performance was prejudicial because there is a reasonable probability that the outcome of the appeal attacking the substantive reasonableness of the sentence would have been different absent his inadequate representation. *Strickland*, 466 U.S. at 687-88, 692-94. If appellate counsel had appropriately raised the district court's mistake of fact regarding the Movant's purported "rape[ ]" of the complainants, the reviewing court would not

21

have even reached the propriety of the substantive reasonableness of the sentence imposed upon the Movant but would have instead reversed the sentence on the ground of a procedural error and would have remanded the case for resentencing, possibly in front of another judge.  Thus, appellate counsel's failure to assert this critical issue that directly affected the outcome of the sentencing hearing undermined confidence in the outcome of the appeal.  *Id.* at 694.  Thus, the Movant's appellate attorney rendered ineffective assistance of counsel.

Accordingly, this Court should grant an evidentiary hearing, after which the Court should vacate the Movant's sentence in its entirety and order a new sentencing hearing.

## GROUND THREE

III.   **Appellate Counsel was Ineffective for Failing to Raise on Direct Appeal that the District Court Erred in Denying Movant's Motion for Mistrial After the Court Interjected its Opinion Impermissibly Bolstering the Witness' In-Court Identification of the Movant in Front of the Jury.**

(a) *Direct Appeal of Ground Three:*

(1) *Was this issue raised on direct appeal?*

No.

(2) *Why was the issue not raised on direct appeal?*

Ineffective assistance of appellate counsel.

(b) *Previous Post-Conviction Proceedings regarding Ground Three:*

Not applicable.

(c) *Relevant facts and discussion:*

Appellate counsel was ineffective for failing to raise on direct appeal that the district court erred in denying the Movant's motion for a mistrial after the judge *sua sponte* informed the jury that witness D.C. had observed the Movant for a longer time period than previously prior to making a positive in-court identification, thereby impermissibly bolstering D.C.'s credibility and her impeached in-court identification of the Movant, which was especially prejudicial because D.C. admitted on cross-examination that she was not 100 percent certain that Movant was the offender, the photo array lineup conducted by law enforcement was improperly suggestive, and D.C.'s selection of the Movant out of the photo array was directly contradicted by her own trial testimony.

## Facts Relating to Movant's Case

On direct examination, witness D.C. testified that in February 2013 she communicated electronically using programs such as Skype with an individual identified as Dodge Smith.  (R. 1030-1031)  During the course of a video chat, D.C. testified that Dodge Smith turned on his video camera, at which point she saw him sit up from a laying-back position and could see the bottom half of his face.  (R. 1035)  She also said that she saw his entire face and that he did not look like a 17-year-old boy; rather, she described Dodge Smith as looking "like you're 47."  (R. 1035-1036)

In addition, D.C. testified that in August 2014 she was presented with a photo array by a Homeland Security agent for purposes of identification.  (R. 1039)

23

She was presented with a series of photographs and explained that the agent "laid them out in front of me and asked me which one did I think was him."  (R. 1039) She selected out Photo Number 5.  (R. 1040)

Furthermore, D.C. made an in-court identification of the Movant.  (R. 1038)

On cross-examination, D.C. stated that she had "a very brief glimpse" of the face of the person on the other end of the camera.  (R. 1042)  Moreover, D.C. answered in the affirmative to the question, "The person that you have picked out in No. 5 looks exactly the same in every way as the person that you say you saw on the camera, correct?"  (R. 1044)  When asked, "No difference, correct?", D.C. responded, "No."  (R. 1044-1045)

Yet, D.C. then testified that the person she saw on the camera did not have a goatee (R. 1045), although the person she identified in Photo Number 5 had a goatee and a mustache.  (R. 1045-1046; Gov. Ex. 121, Photo No. 5)

Finally, D.C. confirmed that when she was shown the photo array, she told the agent that she was 95 percent certain that the man depicted in Photo Number 5 was the person she saw on the webcam.  (R. 1046)  She also testified on cross-examination that, at the time of her trial testimony, she was not 100 percent sure that the man in the photo was the same person on the webcam; instead, she said that she was 95 percent sure.  (R. 1046)

On redirect examination, the prosecutor asked D.C. to estimate her percentage of certainty that she recognized the defendant.  (R. 1047)  D.C. asked,

"May I look?"  (R. 1047)  Then, D.C. said, "100 percent."

On recross examination, D.C. agreed that her degree of certainty was different than what she had expressed earlier on cross-examination.  (R. 1049)

Immediately following defense counsel's recross examination, the district court stated to the jury: "The Court notes for the record that the amount of time that the witness looked at the defendant the first time that she was asked was shorter than the period of time that she looked at the defendant the second time."  (R. 1049)

The defense requested a sidebar and moved for a mistrial, arguing, "I believe that the Court has indicated an opinion on the evidence that is unfavorable to the defendant.  The Court injected that without any request from the government, and the Court bolstered . . . the witness's testimony by, as the judicial official, pointing out that what she was saying may have been correct."  (R. 1050)  Defense counsel further contended, "I didn't say anything about did you look at him longer that time than you looked at him this second time or anything like that.  I didn't make any kind of inference about how long she looked at him except to say that she looked at him long enough to recognize him.  The Court then made a comment that is very prejudicial, because it bolsters what the witness says and totally undermines my cross-examination on a very material point in this case about an eyewitness identification."  (R. 1051)

In denying the defense motion for a mistrial, the district court stated:

I thought carefully about it before I said what I did.  The reason that I did say what I did is because it was true.  The witness did look at the defendant longer, in my estimation, a significantly longer period the second time than the first time, which is the point she was making in response to your question.

The Court has an obligation that's been recognized by the Court of Appeals on many occasions to make the record accurately reflect what happens in the courtroom.  I, as an impartial observer, am obligated to do that.  So I thought carefully about it before I said anything and determined that, because you were fulfilling your obligation appropriately as counsel for your client and cross-examining the witness on the difference between saying 95 and 100 percent, and she was offering an explanation, that it order for it to fully reflect what happened here in the courtroom, I had an obligation as the judge to make the record accurately reflect that, because times are not shown on transcripts of proceedings."

(R. 1053-1054)

Thereafter, the court gave the following cautionary instruction:

Ladies and gentlemen of the jury, you may recall at the beginning of the case when you all were sitting out there as part of the jury pool, I was trying to sort of fill the time and describe the rules of the various people in the courtroom.  And I told you at that time that the official court reporter sits

to my right down here, and that he records words that are spoken in the courtroom as well as non-verbal cues.  And I told you we don't have videotapes of courtroom proceedings, and that there are benefits to – I think I told you there were benefits to not having the official record being . . . videotaped, because there are times when the court reporter can stop a witness and say, "What did you say" or "I didn't hear that" or "Speak up" or something of that nature.  The flip side of that is that when a record of the proceedings is prepared non-verbal cues are reflected in the court reporter's transcript, but the reporter doesn't typically record times.

And so I made the observation that I made about the time of the viewing only for the purpose of making sure that the official record that is prepared of these proceedings reflects what happened in the courtroom, not for the purpose of indicating my view of the evidence.  I reiterate to you: That is your role, not my role.  It's not for me to do.

So I want to be clear.  The only reason I did that was to make the record reflect what happened here in the courtroom.  So it's your job, not my job, to decide the facts.

(R. 1056)  A more-generic cautionary instruction was given to the jury with the final instructions.  (R. 2271)

## Discussion

As pointed out by the United States Supreme Court more than 50 years ago,

27

eyewitness identification testimony is inherently unreliable: "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 228 (1967). In fact, eyewitness misidentifications are the leading factor in wrongful conviction cases and have been involved in more than 70 percent of wrongful conviction cases nationwide. *See* Steven W. Becker, *Post-Conviction DNA Testing, Actual Innocence, and Cold Cases: A Practitioner's Guide to Freeing the Innocent, Exhuming the Past, and Resurrecting the Truth – Making a Case for Seeking Justice over Finality*, GLOBAL COMMUNITY YEARBOOK OF INTERNATIONAL LAW AND JURISPRUDENCE 23 (Oxford Univ. Press 2016). Secondly, jurors are particularly susceptible to such eyewitness identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 111 (1997).

Moreover, "the trial judge must always remember that he occupies a position of preeminence and special persuasiveness in the eyes of the jury, and, because of this, he should take particular care that his participation during trial – whether it takes the form of interrogating a witnesses, addressing counsel, or some other conduct – never reaches the point at which it appears clear to the jury that the court believes the accused is guilty." *United States v. Parodi*, 703 F.2d 768, 775 (4th Cir. 1983) (citation and internal quotations omitted).

Herein, appellate counsel's performance was deficient for failing to assert this important issue on direct appeal. Given the judge's unique role at trial, the jury's obeisance to a judge's interventions, the inherent unreliability of eyewitness

identification testimony, and the jury's susceptibility to such testimony from a sympathetic witness, the district court herein abused its discretion in failing to grant the motion for mistrial following the judge's aforementioned unsolicited remarks supporting D.C.'s in-court identification of the Movant, especially after defense counsel's vigorous impeachment of D.C. in this regard. *See United States v. Dorlouis*, 107 F.3d 248, 257 (4th Cir. 1997) (reviewing decision on motion for mistrial for abuse of discretion). Accordingly, appellate counsel's performance fell below an objective standard of reasonable representation.

Secondly, appellate counsel's failure to assert this argument was prejudicial because there is a reasonable likelihood that the outcome of the direct appeal would have been different had this issue been raised.

The principal issue with respect to D.C. at trial was the reliability of her eyewitness identification of the Movant as the perpetrator. Both parties hotly contested this issue. The defense very effectively impeached the reliability of D.C.'s identification in a variety of ways. First, during cross-examination, D.C. conceded that she had only "a very brief glimpse" of the man on the other end of the screen. (R. 1042) Secondly, after testifying that the man she identified in Photo Number 5 looked exactly the same in every way as the person she saw on the camera, D.C. then backtracked and stated that the man she saw did not have a goatee and facial hair, although the man in Photo Number 5 had a noticeable goatee and facial hair. (R. 1045-1046) Thirdly, D.C. stated that the man she saw looked like he was almost 50 years old, when the Movant was still in his 20s at the time. (R. 1035, 1695)

Fourthly, and most importantly, D.C. confirmed that she told the agent who administered the photo array that she was only 95 percent certain that the man in Photo Number 5 was the offender and that, as of the moment of her trial testimony, she was not 100 percent certain that the Movant was the man she saw on the webcam.  (R. 1046)

Furthermore, in evaluating the reliability of an eyewitness identification, the factors a court considers in determining the likelihood of a misidentification include the opportunity of the witness to view the offender at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior identification of the offender, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.  *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

In the present case, D.C. only had a momentary glimpse of the man's face over a screen and had no opportunity to observe the man during a personal, face-to-face encounter at the time of the offense.  (R. 1042)  D.C.'s degree of attention at the time was not conducive to an accurate identification because she was under a high degree of stress, there is no indication that there was sufficient lighting, and, from D.C.'s description, the lens was moving on the man's side of the camera.  (R. 1035)  Next, there is no indication of the accuracy of D.C.'s prior identification of the man on the other side of the camera.  In fact, D.C. admitted that, during the four times she met with the police, she never gave a description of the offender nor described the room he was in.  (R. 1043)  D.C. admitted that she was only 95 percent certain

of the accuracy of her identification at the time of the photo array and was not 100 percent sure of her identification at trial during cross-examination.  Lastly, the length of time between the incident and the photo array was one year and a half, while the gap between the incident and the in-court identification was more than two years – a substantial interval of time.

Additionally, the photo array itself was improperly suggestive, as D.C. herself admitted on direct examination that the agent "laid [the photographs] out in front of me and asked me which one did I think was him."  (R. 1039)  By the agent indicating to D.C. that the chief suspect was included in the photo array, which, at the same time, revealed that the agent knew the suspect, the objectivity of the photo array was irreparably compromised.  *See* James M. Doyle, *Criminal Law: Learning from Error in Criminal Law*, 100 J. CRIM. L. & CRIMINOLOGY 109, 116-17 (2010) (indicating, *inter alia*, that, during a photo array, the witness should be instructed that the perpetrator may or may not be present, and the photo array should be conducted by a "blind administrator" who does not know which photo may be the suspect).

Moreover, the cautionary instruction given by the judge in this case did not mitigate the error.  *See Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) ("The naïve assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction.").  To the contrary, it may have compounded the error because it reinforced in the jurors' minds that the judge had emphasized the extended time

frame during which D.C. observed the Movant before she altered her certainty level from 95 to 100 percent in making her dramatic in-court identification. One cannot un-ring a bell. Here, the purported curative instruction simply served to ring the bell a second time.

Lastly, if the judge felt it necessary, as he explained to counsel outside of the presence of the jury (R. 1053-1054), to make a record of the amount of time in which D.C. observed the Movant prior to her revised in-court identification because the written transcripts would not otherwise reflect it, then he could have called a sidebar after D.C.'s testimony and put the fact on the record in the presence of counsel and outside the presence of the jury. This way the record would have been preserved for appellate review without unnecessarily influencing the jury and prejudicing the Movant's right to a fair trial.

For the foregoing reasons, appellate counsel was ineffective for failing to raise on direct appeal the erroneous nature of the district court's denial of the defense's motion for a mistrial after the judge's unsolicited intervention with respect to D.C.'s eyewitness in-court identification.

Accordingly, this Court should grant an evidentiary hearing, after which the Court should grant the Movant a new trial.

13. *Grounds in motion not previously presented in some federal court:*

Ground One and Ground Two were not previously presented in a federal

court due to ineffective assistance of trial and/or appellate counsel.  Ground

Three was raised in the district court during trial but not raised on direct

appeal by appellate counsel.

14. *Motions, petitions, or appeals presently pending:*

None.

15. *Names and addresses of attorneys who represented Movant:*

(a)    *Trial and sentencing:*

Andrew M. Sacks
Sacks & Sacks, P.C.
Town Point Center
150 Boush Street, Suite 501
Norfolk, VA 23510

(b)    *Direct appeal:*

Gregory R. English
English Law Firm, PLLC
601 King Street, Suite 406
Alexandria, VA 22314

16. *Sentenced on more than one count of indictment by same court/same time:*

Yes.  Movant was sentenced on Counts 1 through 29, 31, and 32.

17. *Sentence to be served after serving sentence for judgment being challenged:*

None.

18. *Timeliness of Motion:*

Movant's motion is timely in that is it filed within one year of the date on which the judgment of conviction became final.  *See* 28 U.S.C. § 2255(f)(1).


Conclusion

For all of the foregoing reasons, the Movant respectfully requests that the Court advance his motion for a full evidentiary hearing, grant his motion to vacate, set aside or correct illegal sentence, vacate his conviction on Count Fourteen, as well as on Count One, order a new trial, vacate his sentence, order a new sentencing hearing, and for such further relief as the Court deems just and proper.

Respectfully submitted,


s/ James R. Theuer

James R. Theuer (VSB #68712)
James R. Theuer, PLLC
555 East Main Street, Suite 1212
Norfolk, VA  23510
Tel: (757) 446-8047
Fax: (757) 446-8048
jim@theuerlaw.com


s/ Steven W. Becker

Steven W. Becker
Law Office of Steven W. Becker LLC
500 N. Michigan Avenue, Suite 600
Chicago, Illinois 60611
(312) 396-4116
swbeckerlaw@gmail.com

*Pro hac vice* admission pending

Attorneys for Daniel Chase Harris

34

DECLARATION

I, Daniel C. Harris, declare under penalty of perjury that the foregoing is true and correct.

Executed on 2/22/2018.

DANIEL C. HARRIS
Signature of Movant

## <u>CERTIFICATE OF SERVICE</u>

I, James R. Theuer, certify that on March 15, 2018, I caused a copy of the foregoing **Motion to Vacate, Set Aside, or Correct Illegal Sentence Pursuant to 28 U.S.C. § 2255** to be served via the CM/ECF system of the United States District Court for the Eastern District of Virginia, Norfolk Division, upon the following:

Elizabeth M. Yusi (elizabeth.yusi@usdoj.gov)
Office of the United States Attorney
8000 World Trade Center
101 West Main Street, Suite 8000
Norfolk, VA  23510
Attorney for the United States of America

<u>s/ James R. Theuer</u>
James R. Theuer (VSB# 68712)
James R. Theuer, PLLC
555 East Main Street, Suite 1212
Norfolk, VA  23510
Tel: (757) 446-8047
Fax: (757) 446-8048
jim@theuerlaw.com
Attorney for Daniel Chase Harris